FILED
United States Court of Appeals
Tenth Circuit

**January 14, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

DANIEL WELLS HERRIMAN,

      Defendant-Appellant.

No. 12-7085

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:11-CR-00063-JHP-1)**

---

Carl Folsom, III (Robert Ridenour, Assistant Federal Public Defender, and Julia L. O'Connell, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Muskogee, Oklahoma, for Defendant-Appellant.

Gregory Dean Burris (Linda A. Epperley, Assistant United States Attorney, Mark F. Green, United States Attorney, and Christopher J. Wilson, Assistant United States Attorney, on the brief), Office of the United States Attorney, Muskogee, Oklahoma, for Plaintiff-Appellee.

---

Before **HARTZ**, **HOLMES**, and **BACHARACH**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

After planting a bomb near a gas pipeline, Daniel Herriman voluntarily

turned himself in to the authorities and confessed. When he was criminally charged for his conduct, he pleaded not guilty and presented a defense to the jury based on his mental illness. Unpersuaded, the jury voted to convict him. Mr. Herriman then sought a downward adjustment to his sentence under § 3E1.1 of the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") on the ground that he had accepted responsibility for his actions. The district court declined to make the adjustment. Mr. Herriman now appeals from that decision, which we review under the jurisdiction conferred by 28 U.S.C. § 1291. The district court did not abuse its discretion in denying the requested adjustment, and we consequently affirm the court's sentence.

## I

On August 10, 2011, an explosive device was discovered near a gas pipeline in Okemah, Oklahoma. When Mr. Herriman saw the bomb reported on the news, he called the police and informed them that he was responsible. Law enforcement interviewed Mr. Herriman, and he offered details relating to the bomb, including what materials he had used and where they could be located in his home.

Based on this information and the ensuing investigation, the government charged Mr. Herriman with attempting to destroy or damage property by means of an explosive, in violation of 18 U.S.C. § 844(i), and illegally making a destructive device, in violation of 26 U.S.C. §§ 5861(f), 5822, and 5871. The

2

district court became concerned at the preliminary and detention hearings that Mr. Herriman was potentially incompetent to stand trial. As a result, it ordered a mental evaluation to determine "whether he [was] suffering from a mental disease or defect rendering him mentally incompetent." R., Vol. I, at 20 (Order, filed Aug. 18, 2011). Pursuant to that order, Jeremiah Dwyer, Ph.D., a forensic psychologist employed by the Bureau of Prisons, examined Mr. Herriman and found no objective evidence that his mental-health condition "would impair his present ability to understand the nature and consequences of the court proceedings against him, or his ability to properly assist counsel in his defense." *Id.*, Vol. III, at 36 (Forensic Evaluation, dated Oct. 11, 2011). The court accepted Dr. Dwyer's conclusion and ruled that Mr. Herriman was fit to stand trial. A jury trial was scheduled, and Mr. Herriman gave notice that he would be asserting an insanity defense.

During trial, in its case-in-chief, the government naturally elicited testimony to prove that Mr. Herriman had engaged in the charged conduct, i.e., that he had constructed and placed the explosive device. Defense counsel almost entirely declined to contest the description of Mr. Herriman's actions offered by the government's witnesses.

When the government rested its case, Mr. Herriman cursorily and unsuccessfully moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The defense then called a series of witnesses to testify to

Mr. Herriman's psychological problems and his mental condition at the time of the incident. Their accounts overlap in large measure, and there is no need to recite each individual's remarks in detail. It suffices for our purposes to describe the overall narrative conveyed by the defense's witnesses. According to that narrative, Mr. Herriman had several mental-health problems—specifically, manic depression, schizoaffective disorder, and post-traumatic stress disorder; the last of these was caused by sexual abuse Mr. Herriman suffered as a minor. Mr. Herriman's symptoms included a tendency to hallucinate voices inside his head. Some of those voices were "command hallucinations," i.e., "voices [that] actually instruct [one] to do things." *Id.*, Vol. II, at 819 (Trial Tr., dated May 9–14, 2012).

When he was thirteen years old, Mr. Herriman attempted to take his own life, and he has been hospitalized repeatedly for psychotic episodes. Mr. Herriman was deeply shaken by the suicide of his mother and by the death of his sister, which may also have been a suicide. Mr. Herriman's mental condition worsened after he moved into his sister's home, where he had seen her dead body. Psychiatrists had prescribed medications for Mr. Herriman's mental issues, but the medications did not always work. More specifically, the medications did not always subdue the voices in Mr. Herriman's head. At the time of the incident leading to his charged crimes, Mr. Herriman was taking antipsychotic medications for his manic depression and for his psychosis and was seeing a psychiatrist

4

regularly.

Under the narrative Mr. Herriman advanced at trial, his mental condition was exacerbated in August 2011 due to the anniversary of his mother's death, which had taken place that same month. In his unstable state, Mr. Herriman planted the bomb at the behest of the imaginary voices that spoke to him. The voices, which "identified themselves as al Qaeda," *id.* at 830, threatened to hand Mr. Herriman over to the individuals who had sexually abused him in his youth if he disobeyed. At the time he built and planted the bomb, Mr. Herriman was affected by his delusions to such an extent that he was not aware of what he was doing and could not distinguish between right and wrong. When he heard a story on the news about the bombing, he "became lucid," *id.* at 655, and, realizing what he had done, immediately called the police and took responsibility for his actions. Without any solicitation from law enforcement, Mr. Herriman volunteered every detail relating to the bomb, including what materials he had used and where they were located in his residence. In so doing, he effectively solved the crime and saved the authorities from having to conduct any investigation.

Rejecting Mr. Herriman's defense, the jury convicted him of both charged offenses. The Presentence Investigation Report ("PSR") that followed stated that Mr. Herriman "maintained his innocence by reason of insanity throughout these proceedings. Therefore, he is not entitled to an adjustment [for acceptance of

5

responsibility] under the provisions of [U.S.S.G. §] 3E1.1."[1] *Id.*, Vol. III, at 67

(PSR, filed Nov. 5, 2012).[2]

Mr. Herriman objected to the recommendation, arguing at the sentencing

hearing "that it was an irresistible impulse that caused [the crime] to happen."

*Id.*, Vol. II, at 317 (Sentencing Tr., dated Dec. 5, 2012). In elaboration, defense

counsel explained that "under the law it would have been improper for Mr.

Herriman to stand in front of a court and plead guilty because there was a true

question of whether he possessed the necessary intent." *Id.* at 317–18. Thus, the

fact that Mr. Herriman pleaded not guilty and went to trial did not, in defense

counsel's eyes, overshadow the fact that he called law enforcement "out of the

blue" and "solved their crime for them." *Id.* at 318. The government responded

that by "contesting the issue of intent by raising the defense of insanity [Mr.

Herriman] [was] contesting a factual issue[,] . . . requiring the government to go

to trial," and he had thereby lost any rightful claim to the acceptance-of-

responsibility reduction. *Id.* at 319.

Having heard the parties' respective positions, the district court overruled

Mr. Herriman's objection and declined to apply the acceptance-of-responsibility

---

[1]    In preparing the PSR, the U.S. Probation Office used the 2011 version of the Guidelines. Neither party disputes its decision to do so, and we will therefore rely on the same version.

[2]    Initially, the PSR advised the district court to apply the reduction, but the probation officer who drafted the report changed her mind upon the government's objection and reversed her recommendation to the district court.

6

adjustment. It reasoned as follows:

> One of the elements that the government was required to prove at trial was that the defendant committed the offenses knowingly and intentionally. By raising insanity as an affirmative defense, the defendant's denial of his intentionality and knowingly committing the offenses directly challenges one of the elements of guilt. Therefore, the defendant is not eligible for reduction [for] acceptance of responsibility in this case.

*Id.* at 322–23. In light of its ruling, the district court sentenced Mr. Herriman to sixty-three months in prison on each of the two counts of the indictment, to be served concurrently, followed by three years of supervised release. Mr. Herriman timely appealed his sentence to our court.

## II

On appeal, Mr. Herriman attacks the district court's refusal to apply the acceptance-of-responsibility adjustment in two related respects: (1) the district court committed reversible error by denying the adjustment; and (2) the district court committed reversible error by failing to offer any factual findings to supports its decision. As explained below, both arguments are foreclosed by our binding precedent, and we are therefore compelled to reject them and affirm the sentence imposed by the district court.

## A

Mr. Herriman urges us to reverse the district court on the basis that it improperly refused to adjust his sentence downward to reflect his acceptance of responsibility, as permitted by U.S.S.G. § 3E1.1, and that it found insufficient

7

facts to warrant that refusal. "Our overall standard of review is abuse of discretion." *United States v. Lopez-Avila*, 665 F.3d 1216, 1218 (10th Cir. 2011). More specifically, both of Mr. Herriman's contentions must be analyzed under the rubric of procedural error. *See United States v. McGehee*, 672 F.3d 860, 874 (10th Cir. 2012) (deeming a challenge to the district court's denial of an acceptance-of-responsibility adjustment "a claim of procedural error"); *United States v. Koufos*, 666 F.3d 1243, 1254 (10th Cir. 2011) ("A court may commit procedural error in imposing a sentence by . . . 'failing to adequately explain the chosen sentence.'" (quoting *Gall v. United States*, 552 U.S. 38, 46 (2007)), *cert. denied*, --- U.S. ----, 132 S. Ct. 2787 (2012).

Within the specific context of acceptance-of-responsibility adjustments, we have acknowledged that "'[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility' and 'is entitled to great deference on review.'"[3] *United States v. Collins*, 511 F.3d 1276, 1280–81 (10th Cir. 2008) (alteration in original) (quoting *United States v. Hamilton*, 413 F.3d 1138, 1145 (10th Cir. 2005)); *see United States v. Melot*, 732 F.3d 1234, 1243–44 (10th Cir. 2013) ("A district court has wide discretion in determining whether a

---

[3] Mr. Herriman proposes a less deferential standard on the ground that the district court found inadequate facts in refusing the adjustment. In Part II.C., *infra*, we reject the premise of this argument, i.e., that the district court's explanation of its sentence was inadequate, so we will proceed to apply the deferential standard articulated above.

defendant qualifies for the acceptance-of-responsibility reduction, and this court will not reverse the court's decision unless it is clearly erroneous."); *see also United States v. Sarracino*, 340 F.3d 1148, 1174 (10th Cir. 2003) (noting that a sentencing court's denial of the reduction "should not be disturbed unless it is without foundation"). A defendant must prove to the district court "'by a preponderance of the evidence that he is entitled' to the acceptance of responsibility adjustment." *United States v. Benoit*, 713 F.3d 1, 24 (10th Cir. 2013) (quoting *United States v. Portillo-Valenzuela*, 20 F.3d 393, 394 (10th Cir. 1994)).

**B**

We turn first to Mr. Herriman's argument that the district court committed reversible error when it declined to recognize that he had accepted responsibility within the meaning of the Guidelines and thus declined to grant a downward adjustment to his sentence. For the reasons that follow, we cannot accept Mr. Herriman's argument and instead conclude that the district court did not abuse its discretion in this regard.

**1**

Our analysis begins with the plain language of the sentencing provision at issue, and its admonition to district courts that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense," the sentencing court should "decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a).

9

Application Note 2 to § 3E1.1 brings us even closer to the crux of the dispute, as it forms the basis for the district court's ruling and the grounds for Mr. Herriman's appeal. To quote the Note in full, it clarifies that the acceptance-of-responsibility

> adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

*Id.* § 3E1.1 cmt. n.2. Reduced to its essence, Mr. Herriman's thesis is that his case represented one of the "rare situations" in which a defendant insists upon a trial and yet is still entitled to the benefit of the downward adjustment.

Only once before in a precedential decision have we upheld a district court's decision to grant an acceptance-of-responsibility adjustment to a defendant who forced the government to take its evidence to a jury—specifically, *United States v. Gauvin*, 173 F.3d 798 (10th Cir. 1999). *See United States v. Alvarez*, 731 F.3d 1101, 1105 (10th Cir. 2013) (characterizing *Gauvin* as "the one case in which we approved [application of § 3E1.1 after trial]" (alteration in

10

original) (quoting *United States v. Sims*, 428 F.3d 945, 961 (10th Cir. 2005)) (internal quotation marks omitted)), *pet. for cert. filed* (U.S. Dec. 30, 2013) (No. 13-8104).

The defendant in *Gauvin* committed an assault while intoxicated. 173 F.3d at 801. Believing that Mr. Gauvin's circumstances constituted one of the "rare situations" discussed in Application Note 2, the district court adjusted his sentence for acceptance of responsibility. *See id.* at 805. The government appealed, and we affirmed. "Mr. Gauvin," we explained, "admitted to all the conduct with which he was charged. He simply disputed whether his acknowledged factual state of mind met the *legal criteria* of intent to harm or cause apprehension." *Id.* at 806 (emphasis added). Going into further detail, we observed that "[w]hile a jury disagreed with Mr. Gauvin's defense that he lacked the requisite intent to commit the crime, that does not undermine the good faith in which the district court found this defense was asserted." *Id.* We emphasized that "Mr. Gauvin argued that he did not intend, while drunk and scared, to cause injury to others. Further, he contended that his drunkenness rendered him incapable of forming the requisite mens rea." *Id.*

For all intents and purposes, as we saw it, Mr. Gauvin's argument represented "essentially a challenge to the applicability of the statute to his conduct" and was thus compatible with an adjustment for acceptance of responsibility. *Id.* Our analysis then concluded with the caveat that "[a]lthough

11

we recognize that such adjustments are 'rare,' and [although we] might not have reached the same decision [as the district court], in light of the deference afforded the sentencing judge, we hold the district court did not err in granting a downward [adjustment] for acceptance of responsibility." *Id.* (citation omitted).

Since handing down our decision in *Gauvin*, we have had occasion to clarify and refine it. In particular, we have taken care to highlight the importance of the deferential standard of review to *Gauvin*'s holding. That is to say, "in *Gauvin*, we merely accorded the district court the requisite deference in upholding its decision to *grant* the two-level reduction." *McGehee*, 672 F.3d at 877; *cf. Benoit*, 713 F.3d at 25 (affirming a district court's refusal to apply the adjustment with reference to the deference *Gauvin* gave to the opposite determination). Significantly, "[w]e did not indicate that other sentencing courts would be obliged to reach the same conclusion on similar facts." *McGehee*, 672 F.3d at 877; *see United States v. Saffo*, 227 F.3d 1260, 1272 (10th Cir. 2000) ("Here, under the same principles used in *Gauvin* that looked to the good faith of the defendant's defense and afforded deference to the sentencing judge's determination on that issue, we hold that the district court did not err in *denying* [the defendant] a downward [adjustment] for acceptance of responsibility." (emphasis added)). Quite to the contrary, "we might well uphold their decisions on similar facts to *deny* the acceptance-of-responsibility adjustment." *McGehee*, 672 F.3d at 877; *see United States v. Day*, 223 F.3d 1225, 1231 (10th Cir. 2000) ("Just as we gave

12

deference to the district court's determination in *Gauvin*, we also give deference to the district court's determination here [that the defendant was not entitled to the adjustment] absent any compelling evidence to the contrary.").

Furthermore, significantly, we have interpreted *Gauvin* to allow for adjustments only where a "defendant admitted to all the conduct with which he was charged but simply disputed whether his acknowledged factual state of mind met the legal criteria of intent required by the applicable statute." *United States v. Tom*, 494 F.3d 1277, 1281 (10th Cir. 2007) (quoting *Sims*, 428 F.3d at 961) (internal quotation marks omitted); *see McGehee*, 672 F.3d at 878 (drawing a distinction between Mr. Gauvin, who exercised his constitutional right to a trial "only to 'preserve issues that do not relate to factual guilt,'" and a defendant who "declined in significant measure to relieve the government of its burden of establishing his *factual guilt* of the charged offenses" (emphasis added) (quoting U.S.S.G. § 3E1.1 cmt. n.2)).

Understood in this light, *Gauvin* offers no relief "where defendants have challenged the *factual* element of intent." *See Tom*, 494 F.3d at 1281 (emphasis added); *see also Melot*, 732 F.3d at 1244 (deeming the granting of a § 3E1.1 adjustment clear error where the defendant "did not proceed to trial to preserve an issue unrelated to his factual guilt" but rather "exercised his constitutional right to trial so he could challenge the mens rea element of the crimes charged in the indictment"); *Alvarez*, 731 F.3d at 1105 ("[W]hile a defendant who proceeds to

13

trial to challenge 'whether [his] *acknowledged* factual state of mind met the legal criteria of intent' may, in rare cases, be eligible for a § 3E1.1 reduction, a defendant who disputes the 'factual element of intent' itself will not." (second alteration in original) (quoting *Tom*, 494 F.3d at 1281)).

## 2

To distill the foregoing analysis, we conclude that, in light of the operative deferential standard of review, *Gauvin*'s outcome does not *dictate* the appropriate resolution here (and would not do so even if the facts were similar). Therefore, we focus instead on the general legal principles embodied in *Gauvin* and our other precedent and conclude that, in order to prevail, Mr. Herriman must demonstrate that he *only* disputed purely legal questions in going to trial and did not contest material facts relating to his guilt of the charged offenses. Mr. Herriman has not made that showing.

## a

Putting a finer point on the analysis, the resolution of the question of whether Mr. Herriman was entitled to the acceptance-of-responsibility reduction turns on the nature of what was disputed between the parties at trial: the *fact* of Mr. Herriman's mental condition or the *legal* ramifications of that condition. To ascertain the substance of the dispute between the government and the defense regarding Mr. Herriman's mental condition, it is instructive to consider the parties' dueling presentations to the jury.

14

Before delving into the trial transcript, a word should be said to clarify the terms of our inquiry. Although the line between them is often blurred, a challenge to the *mens rea* element of an offense and the presentation of an insanity defense proceed on different procedural paths and implicate distinct concepts regarding the mental condition of the defendant. *See* Stephen J. Morse & Morris B. Hoffman, *The Uneasy Entente Between Legal Insanity and Mens Rea: Beyond* Clark v. Arizona, 97 J. Crim. L. & Criminology 1071, 1072 (2007) ("Ever since the affirmative defense of insanity took its first truly modern breath . . . its relationship to its cousin, mens rea, has been plagued with confusion." (footnotes omitted)); *see generally United States v. Allen*, 449 F.3d 1121, 1126–27 (10th Cir. 2006) (exploring the distinction between the two concepts). *Mens rea* is "the mental element of the crime charged." *Clark v. Arizona*, 548 U.S. 735, 742 (2006). As such, the government must prove the *mens rea* element beyond a reasonable doubt. *See United States v. Johnson*, 57 F.3d 968, 973 (10th Cir. 1995). On the other hand, insanity is an affirmative legal defense a defendant must raise and prove by clear and convincing evidence; in particular, a defendant must show that "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality of the wrongfulness of his acts." *See* 18 U.S.C. § 17. *See generally* Morse & Hoffman, *supra*, at 1074 ("Even if the state can prove all the elements beyond a reasonable doubt, the defendant may

15

avoid criminal liability by establishing an affirmative defense of justification or excuse."); *id.* at 1089–90 ("[E]ven the most delusional or hallucinating person can form the requisite mental state. . . . [A] person suffering from auditory hallucinations who hears God's voice command him to kill surely forms the intention to kill when he kills in response to the hallucinated command." (footnotes omitted)).

We need not examine additional distinctions between the two concepts—i.e., the *mens rea* element and the insanity defense. For our purposes, the significant point is that both concepts relate to a defendant's mental condition at the time of the offense and both may form the foundation for a defendant's acquittal—either through an identified failure of proof as to the *mens rea* element of the crime or through the affirmative establishment of an insanity defense. *See id.* at 1096–97 ("[T]he mens rea issue is entirely distinct from the legal insanity issue, even if precisely the same evidence would be relevant to adjudicating both claims. . . . [T]he same evidence that a defendant was delusional may both negate mens rea and support a finding of legal insanity, but the questions being answered by the evidence are different." (footnote omitted)). And, from our review of the record, it is patent that Mr. Herriman relied on both concepts with the precise objective of acquittal in mind.[4]

---

[4]        Although the district court's analysis in denying Mr. Herriman a

(continued...)

16

Specifically, Mr. Herriman's counsel explained why he went to trial during the sentencing proceeding: "[U]nder the law it would have been improper for Mr. Herriman to stand in front of a court and plead guilty because there was a true question of whether he possessed the necessary intent." R., Vol. II, at 317–18. That is a *mens rea* argument.[5] *See United States v. Brown*, 326 F.3d 1143, 1146–47 (10th Cir. 2003) (discussing how a defendant's mental condition can show that he was incapable of having the requisite *mens rea* to commit the crime). As for the insanity defense, it was explicitly presented to the jury. *See* R., Vol. I, at 120 (Jury Instrs., filed May 14, 2012).

Furthermore, it is also beyond peradventure that Mr. Herriman's *mens rea* argument and his insanity argument were both related to his guilt. Simply put,

[4](...continued)
downward adjustment for acceptance of responsibility is arguably not entirely pellucid in drawing a line of demarcation between the two related concepts of *mens rea* and insanity, we are confident that the court recognized that Mr. Herriman's defense at trial implicated both concepts, and that this defense was aimed at producing an acquittal. *See* R., Vol. II, at 322 (discussing *mens rea* as "[o]ne of the elements that the government was required to prove at trial," which Mr. Herriman's defense contested, and specifically noting that Mr. Herriman's "raising [of] insanity as an affirmative defense" "directly challenge[d]" his guilt).

[5] During his closing argument, Mr. Herriman's counsel at times conflated his insanity defense with his *mens rea* argument. *See* R., Vol. II, at 995 ("The law punishes intent. Did the person intend to commit the crime? Because if someone does not have the free will, the volitional ability to know what is right or wrong, then we as a society don't punish that person."); *id.* at 1007 ("[I]f the person doesn't have mens rea, the thought process, the free will, then he's not guilty by reason of insanity."). At the very least, the jury and the prosecution could have understood Mr. Herriman to be putting both concepts at issue.

17

had the jury embraced either argument, it likely would have acquitted Mr.

Herriman. *See id.* at 121 ("You should render a verdict of 'not guilty only by

reason of insanity' if you find, by clear and convincing evidence, that the

defendant was insane when he committed the crime charged."); *United States v.*

*Dyke*, 718 F.3d 1282, 1286 (10th Cir.) (reiterating that where "the defendant

failed to form the necessary *mens rea* for an offense, he must be acquitted"), *cert.*

*denied*, --- U.S. ----, 134 S. Ct. 365 (2013).[6]

Having concluded that Mr. Herriman raised his mental condition to show

*both* that he did not possess the necessary *mens rea* and that, even if he did, he

was not guilty by virtue of his insanity, and having resolved that both issues were

related to Mr. Herriman's guilt, the only question that remains in our analysis is

whether the parties agreed to the facts regarding those issues and disputed only

how the law applied to those facts. *See Melot*, 732 F.3d at 1244 (deeming the

granting of a § 3E1.1 adjustment clear error where the defendant "did not proceed

to trial to preserve an issue unrelated to his *factual* guilt" (emphasis added));

---

[6] The jury instructions listed as an element of the 18 U.S.C. § 844(i) charge that "the defendant acted maliciously," R., Vol. I, at 102, which the instructions defined as "intentionally or with willful disregard of the likelihood that damage or injury will result," *id.* at 106. With respect to the 26 U.S.C. § 5861(f) charge, the instructions required the jury to find that Mr. Herriman "knowingly made a firearm," *id.* at 109, and defined "knowingly" as "voluntarily and intentionally, and not because of mistake or accident," *id.* at 112. The instructions required the government to prove beyond a reasonable doubt "each and every essential element constituting the offense[s]." *See id.* at 98.

18

*McGehee*, 672 F.3d at 878 (drawing a distinction between Mr. Gauvin, who exercised his constitutional right to a trial "only to 'preserve issues that do not relate to factual guilt,'" and a defendant who "declined in significant measure to relieve the government of its burden of establishing his factual guilt of the charged offenses" (quoting U.S.S.G. § 3E1.1 cmt. n.2)).

We can simplify the question even further. Mr. Herriman's *mens rea* argument and his insanity defense were both based on his mental condition. The dispositive question, then, is whether the parties were in agreement regarding the facts relating to that condition and the condition's effects on Mr. Herriman at the time of the charged crime. After reviewing the record, we are confident that they were not.

We have already outlined the defense's straightforward theory regarding Mr. Herriman's mental condition and need not reiterate it at length. Suffice it to say, the defense's theory was that Mr. Herriman was in a profoundly delusional state at the time he committed the alleged offense. As demonstrated by the following review of the trial transcript, the government took the opposite position: it maintained that Mr. Herriman was not in fact delusional or psychotic at the time he created the bomb and placed it near the gas pipeline.

At first, it is true, the government's case focused on Mr. Herriman's actions rather than his mental condition. But as soon as the defense put on its own witnesses to speak to Mr. Herriman's psychological condition, the

19

prosecution took sharp exception to the defense's narrative. For example, when the defense put on Mr. Herriman's son and ex-wife, the prosecution on cross-examination asked a series of questions plainly designed to illustrate Mr. Herriman's cogency and lucidity at the time of the offense. *See* R., Vol. II, at 667 ("Your dad didn't make any wrong turns trying to get to your aunt's house, did he?"); *id.* ("Isn't it true that he made it there without any problem[?]"); *id.* at 668 ("And I take it your dad didn't have any problem buying that tire, did he? . . . Got his money out and paid for it; is that right?"); *id.* at 670 ("And is [Mr. Herriman] explaining the problems? . . . He's making sense; right?"); *id.* at 769–70 (suggesting that Mr. Herriman's plan to buy a bicycle to ride ten miles to work every day was not outlandish, as the defense had argued); *cf. id.* at 770–71 (in response to defense counsel's discussion of Mr. Herriman's "obsession with" rabbits and goats, asking, "[W]hen he bought a rabbit, did he call it a goat?").

Along similar lines, other questions submitted by the government to the defense's witnesses were clearly intended to persuade the jury that Mr. Herriman's mental condition was being adequately treated at the time the bomb was made and planted. *See id.* at 768 (asking Mr. Herriman's ex-wife whether Mr. Herriman was aware "that, if any time he has a problem, he can just call [his psychiatrist]; isn't that correct?"); *id.* at 785 ("And when he had a problem, he would call [his psychiatrist] or he would just come in; is that correct?); *id.* at 791 ("Did . . . Mr. Herriman . . . indicate that he was being compliant with his

20

medication?”).

Perhaps most significantly of all, the government pushed back on the purported truth of Mr. Herriman's claim that his construction and planting of the bomb was entirely a function of the orders he received from the imaginary voices. *See id.* at 788 (asking Mr. Herriman's psychiatrist whether, around the time of the incident, Mr. Herriman had "indicate[d] to you . . . that he was having any type of auditory hallucinations"); *id.* at 860 ("[T]hat would be very unusual for auditory hallucinations to be [so] specific [as to take Mr. Herriman through the steps of putting the bomb together]; isn't that correct?"); *id.* at 862 ("[I]n reference to how to build this bomb, . . . it was his design, and . . . the voices just told him to build the bomb; correct?"). In the same vein, the government elicited testimony to bolster the notion that Mr. Herriman was not having a psychotic episode when he committed the acts for which he was charged. *See id.* at 789–90 ("When you were talking to Mr. Herriman on the 13th of July, did he present any symptoms of someone who was having a manic episode? . . . Did you observe any behavior which would give you the impression that Mr. Herriman was having some sort of serious depressed episode?").

The government painted a similarly positive picture of Mr. Herriman's mental condition through its two rebuttal witnesses. The first, a physician's assistant who observed Mr. Herriman shortly before he deposited the bomb, was called solely to testify that Mr. Herriman did not appear to be in a manic

21

condition at the time. Following the physician's assistant's testimony, the government called Dr. Dwyer (i.e., the psychologist employed by the Bureau of Prisons). Dr. Dwyer was asked whether someone with schizoaffective disorder would "be unable to understand right and wrong necessarily." *Id.* at 899. In his estimation, "[i]t would depend on the nature of the symptoms at the time that we were talking about." *Id.* at 899–900. As it did during its cross-examination of the defense's witnesses, the government encouraged Dr. Dwyer to underscore how unlikely it was that Mr. Herriman was *forced* by the voices to make the bomb. *See id.* at 902 ("So [Mr. Herriman] indicated that he understood that these were voices . . . that were communicating with him?").

The government also used Dr. Dwyer to rebut the proposition—asserted by the psychologist who testified on behalf of the defense—that Mr. Herriman's apparent attempt to spray-paint the bomb in order to sabotage it was reflective of delusional behavior. In Dr. Dwyer's opinion, the spray-painting was possibly the product of delusional thoughts, "but not necessarily." *Id.* at 906–07. The prosecutor then queried, following up on the same subject, "The desire to not want to hurt someone, is that delusional behavior?" *Id.* at 907. "Generally speaking, no," Dr. Dwyer replied. *Id.* While Dr. Dwyer was on the stand, the government returned to the theme that Mr. Herriman was in possession of his faculties around the time of the alleged offense. In particular, Dr. Dwyer described Mr. Herriman's inculpatory statements to a 911 operator as "coherent,

logical," and indicative of an ability to "provide directions and make factual statements." *Id.* at 908.

In its closing argument, the government tied all of these various points together. It began by acknowledging that there was no question but that Mr. Herriman had a mental disease or defect. But it then turned to the factual matter of whether Mr. Herriman was in the throes of his mental disease at the time he made and planted the bomb. On that issue, the government disagreed strenuously with the theory put forth by the defense. The government's perspective was illuminated as the prosecutor ran through each of the points he had made through his cross-examinations of the defense's witnesses and through his direct examinations of the rebuttal witnesses: (1) Mr. Herriman could and would have sought help if he had needed it, and he did not do so; (2) Mr. Herriman was lucid and not in a manic state at the time of the incident; and (3) the voices did not provide any specifics on how to assemble the bomb.

**b**

To summarize, the defense averred at trial that Mr. Herriman was delusional and psychotic at the time he constructed and placed the bomb, whereas the government depicted him as someone who is *sometimes* psychotic and delusional but was not so while committing the crime of which he was accused. As such, there can be no serious contention that the parties were in agreement regarding the *fact* of Mr. Herriman's mental condition at the time he made and

23

placed the bomb. And the nature of their factual disagreement was, at the very least, material to Mr. Herriman's guilt of the charged offenses. Accordingly, on this record, we cannot discern how Mr. Herriman could qualify for a § 3E1.1 downward adjustment. *See, e.g.*, *Melot*, 732 F.3d at 1244 (deeming the granting of a § 3E1.1 adjustment clear error where the defendant "did not proceed to trial to preserve an issue unrelated to his *factual* guilt" (emphasis added)).

To be sure, there was a legal dimension to the dispute over Mr. Herriman's mental condition, in the sense that the parties were at odds over whether Mr. Herriman was sufficiently conscious or aware of the wrongfulness of his conduct to satisfy the legal criteria of an insanity defense. *See* R., Vol. I, at 120 ("For you to return a verdict of not guilty only by reason of insanity, the defendant must prove 1) that he suffered from a severe mental disease or defect when the crime was committed; *and* 2) that, as a result of this mental disease or defect, he was not able to understand what he was doing or to understand that it was wrong."). However, that is not enough; our law demands more. Specifically, it demands a showing that the legal aspect of Mr. Herriman's mental condition was the *only* dimension of his condition that he put at issue by going to trial. *See McGehee*, 672 F.3d at 878 (limiting post-trial § 3E1.1 reductions to defendants who insist on presenting their claims to a jury "*only* to 'preserve issues that do not relate to factual guilt'" (emphasis added) (quoting U.S.S.G. § 3E1.1 cmt. n.2)). And this is where Mr. Herriman falls short.

24

We are not insensitive to the reality that it may not always be easy to tell when a challenge is purely legal—thereby making a defendant who advanced such a challenge at trial eligible for a § 3E1.1 adjustment—and when a challenge embodies a factual component, such that the defendant who pursued such a challenge at trial would be disqualified from receiving a § 3E1.1 adjustment. Nevertheless, wherever in this context the line between law and fact is, we have no doubt that Mr. Herriman's claim falls cleanly on the wrong (i.e., factual) side of it. For, he and the government fiercely contested whether he was—as a factual matter—psychotic at the time he committed the charged acts. We are content to leave to our colleagues in the future—in cases that present closer questions—the task of sketching in greater detail the contours of this law-fact line.

## C

In addition to his argument predicated on *Gauvin*, Mr. Herriman lodges a closely related claim that the factual findings underlying the district court's decision to deny him the benefit of a § 3E1.1 adjustment were inadequate. Mr. Herriman believes that the defects in the district court's findings have two ramifications: (1) we should accord no deference to the district court's factual findings regarding the acceptance-of-responsibility issue; and (2) the absence of findings is itself a procedural error that calls for reversal. No matter how Mr. Herriman frames the argument or its implications, it is meritless.

It is well-established that a district court has no obligation to "explain *why*

25

a particular adjustment [under the guidelines] is or is not *appropriate*." *United States v. Bowen*, 437 F.3d 1009, 1019 (10th Cir. 2006) (alteration in original) (emphases added) (quoting *United States v. Maldonado-Campos*, 920 F.2d 714, 718 (10th Cir. 1990)) (internal quotation marks omitted). However, "when it is apparent from the court's *optional* discussion that its factual finding may be based upon an incorrect legal standard, we must remand for reconsideration in light of the correct legal standard." *Id.* (emphasis added) (quoting *Maldonado-Campos*, 920 F.2d at 718) (internal quotation marks omitted).

Recall that the district court explained its decision with the following remarks:

> One of the elements that the government was required to prove at trial was that the defendant committed the offenses knowingly and intentionally. By raising insanity as an affirmative defense, the defendant's denial of his intentionality and knowingly committing the offenses directly challenges one of the elements of guilt. Therefore, the defendant is not eligible for reduction [for] acceptance of responsibility in this case.

R., Vol. II, at 322–23.

The only authority Mr. Herriman cites in support of his view that the district court's stated rationale here was deficient is *United States v. Montoan-Herrera*, 351 F.3d 462 (10th Cir. 2003). There, we remanded for resentencing because the district court, over the government's objection, had granted a downward adjustment—that we assumed to be for acceptance of responsibility—without even acknowledging the specific Guidelines basis for the

26

adjustment. *See id.* at 467. At bottom, we concluded that the district court committed reversible error because it did not even take the minimal step—in the face of the government's objection—of identifying the particular conduct of the defendant that warranted the acceptance-of-responsibility adjustment. *Compare id.* ("The district court did not state what the adjustment was for nor did it make a finding that the requirements for the adjustment were satisfied."), *with id.* at 467 n.6 ("In sentencing Herrera's co-conspirators, the district court found that they were entitled to the acceptance of responsibility adjustment because they had provided an adequate factual basis for their guilty pleas. . . . We held that these were sufficient 'findings' because they were supported by the record." (citations omitted)).

In reaching this conclusion, we did not suggest that the court was obliged to go further and explain why the conduct found to be sufficient to support the Guidelines adjustment was in fact sufficient. *Cf. id.* at 467 (suggesting that in those cases where we did not require further findings, the requisite act had been done, in that "the district court specifically found defendant was entitled to an adjustment"). It should be obvious then that *Montoan-Herrera* offers Mr. Herriman no succor. Not only did the district court do what *Montoan-Herrera* required—identify the conduct of Mr. Herriman that disqualified him for the acceptance-of-responsibility downward adjustment—it went further and optionally explained *why* that conduct disqualified him for the reduction.

27

Thus, we can only reverse on this claim if "it is apparent from the court's optional discussion that its factual finding may be based upon an incorrect legal standard." *Bowen*, 437 F.3d at 1019 (quoting *Maldonado-Campos*, 920 F.2d at 718) (internal quotation marks omitted). We believe it is clear from our analysis in the preceding section that the district court's rationale was grounded in the governing law. Accordingly, we discern no error here.

## III

For the reasons explicated above, we **AFFIRM** Mr. Herriman's sentence.