FILED
United States Court of Appeals
Tenth Circuit

July 29, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CHASE LANE ROCHA,

    Defendant - Appellant.

No. 24-7019

_____

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:23-CR-00036-DCJ-1)**
_____

Stuart W. Southerland, Assistant Federal Public Defender (Scott Graham, Federal Public Defender, McClayn Gullekson, First Assistant Federal Public Defender and Richard L. Koller, Assistant Federal Public Defender, with him on the briefs), Office of the Federal Public Defender for the Eastern District of Oklahoma, Muskogee, Oklahoma, for the Defendant-Appellant.

Patrick M. Flanigan, Assistant United States Attorney (Christopher J. Wilson, United States Attorney, with him on the brief) Office of the United States Attorney for the Eastern District of Oklahoma, Muskogee, Oklahoma, for the Plaintiff-Appellee.
_____

Before **HOLMES**, Chief Judge, **SEYMOUR**, and **BACHARACH**, Circuit Judges.
_____

**HOLMES**, Chief Judge.
_____

    Defendant-Appellant Chase Lane Rocha appeals the sixty-month sentence

imposed by the district court after a jury found him guilty of Involuntary

Manslaughter in Indian Country in violation of 18 U.S.C. §§ 1112(a) and (b).  Mr.

Rocha argues that the district court's sentence was neither procedurally nor

substantively reasonable.  Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**.

## I. BACKGROUND

### A. *Factual Background*

**1.**

In January of 2023, Mr. Rocha and his girlfriend, Amaya Eskue, were living

together in a camper in Boswell, Oklahoma.  Ms. Eskue was six weeks' pregnant.

Mr. Rocha's mother, Riki Amix, lived in a trailer on the property with her two minor

children and Dakota Amix, her husband of thirteen years and Mr. Rocha's stepfather.

The relevant events began at approximately 6:00 p.m. on January 23, 2023,

when Mr. Rocha, Mr. Amix, and Mr. Rocha's cousin, Johnathan Rocha ("Johnny"),

left the Boswell residence to drive to a liquor store.  After making that stop, the

group spent several hours at a friend's house, where Mr. Rocha and others consumed

alcohol.  They returned to Mr. Rocha's camper at approximately 1:00 a.m.  Ms.

Eskue was at the residence.  She observed that Mr. Rocha appeared to be drunk: he

struggled to enter the camper, vomited repeatedly in the bathroom, and "was slurring

his words and not making a lot of sense."  Aplt.'s App., Vol. III, at 50 (Trial Tr., Vol.

I, held Oct. 2, 2023).

Before long, Mr. Rocha stumbled out of the camper and encountered Mr. and

Ms. Amix outside.  A conflict ensued.  Mr. and Ms. Amix began to argue, and Ms.

Amix argued with Mr. Rocha, too.  At one point, Mr. Rocha raised his voice to his

2

mother.  Mr. Amix admonished him.  Then, Mr. Amix—who also appeared drunk— headbutted Mr. Rocha in his face.  The two men wrestled to the ground, and Mr. Amix pinned Mr. Rocha underneath him.  After a few minutes, Mr. Amix released Mr. Rocha and stood up.  Mr. Rocha was distraught: he did not understand why Mr. Amix had hit him.  His voice grew hoarse from screaming.  The verbal argument continued between Mr. Amix, Ms. Amix, and Mr. Rocha, while Johnny and Ms. Eskue looked on.  After several more minutes, Mr. Amix punched Mr. Rocha in his face.  They went to the ground again, and Mr. Amix continued punching Mr. Rocha until Johnny and Ms. Amix managed to separate them.  Once free, Mr. Rocha ran into his camper.  Johnny and Ms. Eskue followed him.  Mr. Amix returned to his trailer, accompanied by Ms. Amix.  They were joined by Ms. Pierce, Ms. Amix's sister, who had just arrived.  Ms. Pierce helped Mr. Amix to his bedroom and put him to bed.

Back in his camper, Mr. Rocha remained drunk and distraught.  And as Johnny and Ms. Eskue entered the camper, they saw that Mr. Rocha had armed himself with a pistol.  Johnny was able to wrest it from him with Ms. Eskue's help.  But Mr. Rocha quickly retrieved a second pistol from under the couch.  Johnny took that gun from him, too, and Mr. Rocha exited the trailer.  Johnny gave the guns to Ms. Eskue, who walked back to the bedroom to hide them.  One of the weapons accidentally discharged.  Nobody was injured, but the sound of the gun brought Mr. Rocha back into the camper to check if Ms. Eskue was okay.  She assured him that she was not injured, and she went outside to clean out her car.  She intended to leave the scene

3

with Mr. Rocha to deescalate the situation.  Johnny followed and assisted Ms. Eskue by packing and preparing to depart.

But in the interim, Mr. Rocha had retrieved a third gun from his camper—a single-action revolver with a hair trigger.  One bullet was chambered.  While Ms. Eskue was cleaning the car, Mr. Rocha wandered off in the direction of the Amix trailer carrying the revolver.

About halfway between the camper and the Amix trailer, Ms. Pierce encountered Mr. Rocha.  He was "crying and upset." *Id*. at 120.  He ran around her and stopped outside of the Amix trailer.  Ms. Amix came outside, and she and Ms. Pierce tried to convince Mr. Rocha to leave with the weapon because there were children in the trailer.  Ms. Eskue and Johnny soon joined the group and attempted to calm Mr. Rocha down.

According to Ms. Pierce, at one point, Mr. Rocha pointed the gun toward Ms. Amix, who was standing in the doorway of a car, and Ms. Amix fell back into the doorway to avoid the gun's firing line.  Ms. Pierce attempted to take the gun away from Mr. Rocha, but he told her to "get away from him." *Id*. at 122.

Eventually, the group surrounded Mr. Rocha—Johnny, Ms. Eskue and Ms. Pierce beside Mr. Rocha, and his mother, Ms. Amix, standing directly in front.  They continued to negotiate with Mr. Rocha for ten to fifteen minutes.  Ms. Eskue noticed that Mr. Rocha seemed scared, sad, and angry during this time, and Mr. Rocha testified that he was waving his hands in distress.

4

Suddenly, the gun discharged.  Ms. Amix fell to the ground, screaming.  She was shot.  The bullet passed through her right forearm and entered her chest on the right-hand side.  Ms. Eskue was in shock for thirty seconds from the noise of the gunshot.  By the time she regained her senses, Mr. Rocha was gone.

At approximately 1:45 a.m., Ms. Eskue called 911.  Ms. Pierce, Ms. Eskue, and Mr. Amix drove Ms. Amix to Soper, Oklahoma, where they met paramedics who transported Ms. Amix to the hospital.  Ms. Amix died from her injuries shortly thereafter.

**2.**

After the shooting, Mr. Rocha was "scared."  *Id.* at 342 (Trial Tr., Vol. III, held Oct. 4, 2023).  He fled on foot through the pasture surrounding the property, discarding the revolver into a ditch as he ran.  Then he returned to his camper, got into a truck, and drove to Texas to seek the counsel of his father, Pedro Rocha.  He learned that his mother was dead when he called his father at about 7:30 a.m. the next morning from a Walmart parking lot in McKinney, Texas.  Mr. Rocha met his father at a nearby convenience store, and the two of them returned to Oklahoma, where Mr. Rocha surrendered to law enforcement.

Mr. Rocha consented to a Mirandized interview, after his arrest, with FBI Special Agent Karen Castiblanco and Anthony Garvin, a criminal investigator with the Choctaw Nation Lighthorse Police Department.  In the interview, Mr. Rocha admitted that he shot his mother and described the episode as a "horrible accident." Aplee.'s Suppl. App., Vol. II, Gov't Ex. 29 at 00:09–00:29.  He described where he

5

had discarded the revolver, and law enforcement officials were able to locate and retrieve the weapon based on the information he provided.  Additionally, Mr. Rocha recounted "pulling the trigger."  *See* Aplee.'s Suppl. App., Vol. II, Gov't Ex. 31 at 00:11–00:24 ("I just remember pulling the trigger, seeing my mom fall, and then I just—threw the gun and took off through the pasture.").  He also admitted that he knew the gun was loaded and that he was intoxicated while handling it.  Mr. Rocha told investigators that he had retrieved the gun from his camper because, in his words: "I basically just wanted to hurt [Mr. Amix] like he did me, and—that's really all I can say[], because I was drunk.  I can't really fuckin' control myself, I guess."  Aplee.'s Suppl. App., Vol. II, Gov't Ex. 29 at 03:53–04:09.

## B. *Procedural History*

### 1.

On March 8, 2023, a grand jury in the Eastern District of Oklahoma returned an indictment charging Mr. Rocha with: Murder in Indian Country (specifically, first-degree premeditated murder), in violation of 18 U.S.C. §§ 1111(a), 1151, and 1153 (Count One); Use, Carry, Brandish, and Discharge of a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), and (iii) (Count Two); and Causing the Death of a Person in the Course of a Violation of 18 U.S.C. § 924(c), in violation of 18 U.S.C. § 924(j)(1) (Count Three).

A jury trial was conducted from October 2 to 4, 2023.  The government put on eight witnesses, and Mr. Rocha put on one witness, a firearms expert.  Mr. Rocha also testified on his own behalf.

Mr. Rocha testified that the shooting was unintentional, consistent with his prior admissions. More specifically, he stated that he shot his mother while "waving [his hands] around" and "making hand gestures," that he was drunk, and that the shooting was a horrible accident. Aplt.'s App., Vol. III, at 370–71. Notably, Mr. Rocha consistently denied that he intended to shoot his mother. He testified that he was "shocked and scared" when the gun discharged, and that "I had everybody around me and I didn't know if I had hit somebody or what had happened" until he saw his mother fall and cry out. *Id.* at 338.

During cross-examination, Mr. Rocha's testimony remained consistent: he admitted to shooting his mother but denied intending to do so. He stated that the firearm "just went off in my hand." *Id*. at 347. He also testified that he had pulled the hammer of the revolver back—that is, he "cocked it," *id.* at 339—before the accident occurred. Further, Mr. Rocha stated that when he retrieved the gun from his camper, he had intended to confront Mr. Amix with it. However, Mr. Rocha testified that he changed his mind about confronting his father-in-law as he walked towards Mr. Amix's trailer, and he denied harboring any intent to shoot Mr. Amix.

Notably, there was conflicting testimony at trial as to whether Mr. Rocha pointed the revolver at his mother prior to the shooting. Ms. Pierce testified that, before the revolver discharged, Mr. Rocha pointed it at his mother, and she fell back. According to Ms. Pierce, Mr. Rocha stated that Ms. Amix had chosen Mr. Amix over him and his siblings, and "as long as he lived, he promised that she would never get to see her grandbaby." *Id*. at 127–28. But Mr. Rocha denied (at least intentionally)

7

pointing the gun at his mother before he shot her. *See, e.g.*, *id*. at 350 ("I didn't intentionally point it at her.").

Testimony from FBI Special Agent Castiblanco established that the firearm Mr. Rocha used to shoot the victim was a single-action revolver, meaning the hammer had to be manually pulled back before the weapon could fire. Mr. Rocha testified that he had pulled the hammer back on the revolver prior to its discharge. But when asked whether he pulled the trigger on the firearm, he testified, "Not intentionally. It just went off in my hand." *Id*. at 347. Mr. Rocha's expert witness testified that the revolver had a "light trigger pull," meaning that the trigger was easier to discharge than an average revolver of its type. *Id.* at 321–22. And Ms. Eskue, Ms. Pierce, and Johnny all testified that they believed the shooting was an accident.

After the government rested, Mr. Rocha moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal on the murder charge (Count One), on the theory that there was no evidence of premeditation and that all of the witnesses to the shooting believed that Ms. Amix's death was an accident. The district court reserved ruling on the motion until after the jury returned a verdict.

The district court held a conference on jury instructions after the defense presented its case, at the close of the second day of trial. The government requested instructions on the lesser-included offenses of second-degree murder and voluntary manslaughter, and defense counsel requested an instruction on involuntary

8

manslaughter.  The district court instructed the jury on each of these charges.[1]

Additionally, the district court instructed the jury to proceed to Counts Two and

Three *only* if they found Mr. Rocha guilty of First-Degree (i.e., premeditated) Murder

in Indian Country, Second-Degree Murder in Indian Country, or Voluntary

Manslaughter in Indian Country.

The jury heard closing arguments the following day.  During Mr. Rocha's

closing argument, defense counsel acknowledged that the evidence appeared

---

[1]     As most relevant here, the involuntary manslaughter instruction provided:

> Involuntary Manslaughter is a lesser included offense of Count One of the Indictment, Murder in Indian Country.  18 U.S.C. § 1112 makes it a crime to unlawfully kill a human being without malice: (1) while committing an unlawful act not amounting to a felony, or (2) while committing a lawful act in an unlawful manner, or without due caution and circumspection, which might produce death.
>
> To find the defendant guilty of this crime, you must be convinced that the government has proved beyond a reasonable doubt:

| | |
|---|---|
| **First:** | The Defendant caused the death of Riki Amix, the victim named in the Indictment while the Defendant was taking actions without due caution and circumspection, which actions might produce death; |
| **Second:** | The Defendant knew that his conduct was a threat to the lives of others or it was foreseeable to him that his conduct was a threat to the lives of others; and |
| **Third:** | The killing took place in Indian Country; and |
| **Fourth:** | The Defendant is an Indian. |

Aplt.'s App., Vol. I, at 168 (Jury Instrs., dated Oct. 4, 2023).

sufficient to support a verdict for involuntary manslaughter. After approximately one hour of deliberation, the jury found Mr. Rocha guilty of the lesser-included offense of involuntary manslaughter. Accordingly, the jury did not reach a verdict on Counts Two and Three.

**2.**

On December 20, 2023, the Final Presentence Investigation Report ("PSR") was filed. The PSR calculated a total offense level of 18 and a Criminal History Category of I, resulting in a U.S. Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines") range of 27 to 33 months. The PSR also concluded that because Mr. Rocha "maintained his innocence throughout the[] proceedings," he was not entitled to a two-level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility. Aplt.'s App., Vol. II, ¶ 20, at 9 (PSR, dated Nov. 30, 2023). Mr. Rocha objected to the PSR finding that he was not entitled to the acceptance-of-responsibility reduction.

On March 5, 2024, Mr. Rocha moved for a non-Guidelines sentence. He maintained his objection to the PSR and argued that he should receive a two-level reduction of his offense level for acceptance of responsibility or, in the alternative, a two-level downward variance. The government opposed the motion.

The district court held a sentencing hearing on March 12, 2024. During the hearing, the district court denied Mr. Rocha's request for the two-level reduction for acceptance of responsibility, although the court characterized the objection as a "close call." Aplt.'s App., Vol. III, at 452 (Sentencing Hr'g Tr., held Mar. 12, 2024). The court reasoned that Mr. Rocha did not accept responsibility because he

"contest[ed] or at least didn't admit [] to the mens rea of involuntary manslaughter."
*Id.* at 453.

The district court also denied Mr. Rocha's request for a downward variance. Instead, it adopted the PSR's findings and relied on them as the factual basis for its sentence. After hearing the parties' arguments and Mr. Rocha's allocution, the district court imposed an upward variance—from a Guidelines range of 27 to 33 months to a sentence of 60 months.[2]

In pertinent part, the district court explained its sentencing determination as follows:

> Mr. Rocha, you're a young man. You will have -- this will be behind you. You'll have a lot of life to live. You'll have a lot of making up to do to both your family and society because of what you did. You'll have time to do it.
>
> You know, all I can do is administer what the law demands that I do, okay? But there's a moral component to this. That's my point and that's up to you. That's not up to me. It's up to you.
>
> And so that is between you and your conscience, what you view is the right thing to do and how to be an honorable man in this society.
>
> After you get out of prison, that will be up to you. You know you'll have supervised release, and I'll be watching what you do but I do believe at this time based on your history, I do believe that your counsel's representation that you will go back to work and try to be a productive member of society in that sense.
>
> But there's also the issue of punishment. There's the issue of what society expects of the criminal justice system when someone

---

[2]    Prior to the sentencing hearing, the district court notified both parties by email that the court "was considering . . . an upward variance." Aplt.'s App., Vol. III, at 454.

shoots and kills a family member in a completely avoidable, irresponsible, reckless event like that where you point a cocked firearm with a hair trigger at your mother, okay?

There's what society expects that we do and what provides some level of justice to the victim.

I did read the statement of your mother's husband yesterday, and the kind of details the impacts that this has had on your family, which is to be expected and, of course, is very regrettable.

But considering all these factors, Mr. Rocha, I have -- I have evaluated the sentencing factors as well as the sentencing guidelines. Based upon your conviction for the lesser included offense of involuntary manslaughter in Indian country it's the order and judgment of the court that you, Chase Rocha, are committed to the Bureau of Prisons to be imprisoned on Count One for a term of 60 months.

Aplt.'s App., Vol. III, at 463–65.

Later, the district court added:

[I]n considering what an appropriate sentence is in this case, the Court has considered the sentencing guidelines.  It also considered the factors set forth in 18[] U.S.C[.] [§] 3553(a) to reach what I view is an appropriate and reasonable sentence in this case.  Among other things in varying above the guideline range, the Court has considered the nature and circumstances of this offense, namely the multiple attempts to use a firearm in an altercation with the defendant's stepfather.  The defendant's disposal of the firearm immediately after the shooting, and his immediate flight from the state, and from the scene of the shooting after the homicide.

The Court also would note the factors of need for just punishment and deterrence in varying above the guidelines.

*Id.* at 469–70.

Finally, the district court concluded: "To the extent that I haven't already enumerated my variance, my upward variance, is also based on my first-hand observation of the evidence presented during the trial in this case." *Id.* at 473.

12

Mr. Rocha timely appealed.

## II. DISCUSSION

On appeal, Mr. Rocha challenges the procedural and substantive reasonableness of his sentence. More specifically, he contends that the sentence was procedurally unreasonable because the court denied his request for a § 3E1.1 adjustment for acceptance of responsibility, relied on an impermissible sentencing factor, and did not adequately explain his sentence. Furthermore, he avers that the length of the sentence—especially the upward variance imposed—was substantively unreasonable under the 18 U.S.C § 3553(a) factors. We discuss each of Mr. Rocha's arguments below. Finding them unavailing, we uphold the district court's sentencing judgment.

### A. *Standard of Review*

"[We] review[] sentences for reasonableness under a deferential abuse-of-discretion standard," *United States v. Sayad*, 589 F.3d 1110, 1116 (10th Cir. 2009), "under which we review de novo the district court's legal conclusions regarding the guidelines and review its factual findings for clear error," *United States v. Gantt*, 679 F.3d 1240, 1246 (10th Cir. 2012); *accord United States v. Martinez-Barragan*, 545 F.3d 894, 905 (10th Cir. 2008). "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Crosby*, 119 F.4th 1239, 1246 (10th Cir. 2024) (quoting *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009)). Moreover, "[a] district court abuses its discretion when it relies on an incorrect conclusion of law or a clearly erroneous finding of fact." *United States v. Hemmelgarn*, 15 F.4th 1027,

1031 (10th Cir. 2021) (quoting *United States v. Battle*, 706 F.3d 1313, 1317 (10th Cir. 2013)); *see also Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."); *United States v. Lopez-Avila*, 665 F.3d 1216, 1219 (10th Cir. 2011) ("An error of law is per se an abuse of discretion.").

"Reasonableness review is a two-step process comprising a procedural and a substantive component." *Sayad*, 589 F.3d at 1116 (quoting *Friedman*, 554 F.3d at 1307). "Procedural reasonableness involves using the proper method to calculate the sentence." *Id.* (quoting *United States v. Conlan*, 500 F.3d 1167, 1169 (10th Cir. 2007)). Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007).

"Substantive reasonableness . . . involves 'whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in [§ 3553(a)].'" *Sayad*, 589 F.3d at 1116 (alteration in original) (quoting *Conlan*, 500 F.3d at 1169). Our review is guided by the "recogni[tion] that the district court 'is in a superior position to find facts and judge their import under § 3553(a) in the individual case.'" *Crosby*, 119 F.4th at 1246 (quoting *Gall*, 552 U.S. at 51). "The [district] judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts[,] and gains insights not conveyed by the record." *United*

14

*States v. Barnes*, 890 F.3d 910, 915–16 (10th Cir. 2018) (quoting *Gall*, 552 U.S. at 51). Because our abuse-of-discretion standard applies "'without regard to whether the district court imposes a sentence within or outside the advisory guidelines range,' [] we do not apply a presumption of unreasonableness to sentences outside the guidelines range." *United States v. Cookson*, 922 F.3d 1079, 1090 (10th Cir. 2019) (quoting *Friedman*, 554 F.3d at 1307). "Instead, we 'give due deference to the district court's decision that the § 3553(a) factors, on [the] whole, justify the extent of the variance.'" *Id.* at 1090–91 (alteration in original) (quoting *Friedman*, 554 F.3d at 1307).

It is well-settled that our precedent imposes a "requirement of contemporaneous objection to procedural errors" and that objections that a party fails to raise before the district court are forfeited and, ordinarily, only may be reviewed for plain error. *United States v. Romero*, 491 F.3d 1173, 1177 (10th Cir. 2007). Conversely, as to substantive reasonableness, "when the claim is merely that the sentence is unreasonably long, we do not require the defendant to object in order to preserve the issue." *Martinez-Barragan*, 545 F.3d at 905 (quoting *United States v. Torres-Duenas*, 461 F.3d 1178, 1183 (10th Cir. 2006)).

Although procedural and substantive reasonableness are separate aspects of our reasonableness review, we have acknowledged that the distinction between them "turns murky [] when we consider that the district court's explanation for a given sentence serves a 'dual purpose.'" *Cookson*, 922 F.3d at 1091 (quoting *Barnes*, 890 F.3d at 917). On the one hand, "a district court's explanation of how the § 3553(a)

15

factors apply 'is [itself] a procedural requirement,' and the 'absence of [such] explanation could constitute procedural error.'" *Id.* (first quoting *Barnes*, 890 F.3d at 917; and then quoting *United States v. Lente ("Lente I")*, 647 F.3d 1021, 1031, 1035 (10th Cir. 2011)). On the other hand, "the content of the district court's explanation 'is relevant to whether the length of the sentence is substantively reasonable' because '[a] sentence is more likely to be within the bounds of reasonable choice when the court has provided a cogent and reasonable explanation for it.'" *Id.* (alteration in original) (quoting *Barnes*, 890 F.3d at 917). The synergy between these dual purposes animates our review.

That is because "we rely on the district court's procedurally-required explanation in order to conduct 'meaningful appellate review' of a sentence's substantive reasonableness." *Id.* (quoting *Gall*, 552 U.S. at 50); *see Lente I*, 647 F.3d at 1039 (explaining that "[w]e cannot fulfill our appellate role, however deferential, in assessing the substantive reasonableness of [a] sentence" without an adequate explanation from the district court). Consequently, quite apart from the procedural deficiencies posed by a "limited, brief, or inconsistent explanation," such an explanation additionally hinders our ability to conduct meaningful review and "therefore 'put[s] at risk the substantive reasonableness of any decision [the district court] reached.'" *Cookson*, 922 F.3d at 1091 (alterations in original) (quoting *United States v. Lychock*, 578 F.3d 214, 220 (3d Cir. 2009)). "This is especially true when the sentence varies greatly from the sentencing Guidelines, because 'a major

16

[variance] should be supported by a more significant justification than a minor one.'"

*Id.* at 1092 (alternation in original) (quoting *Gall*, 552 U.S. at 50).

With these dual purposes in mind, we consider Mr. Rocha's procedural and substantive reasonableness challenges in turn and conclude that they are unavailing.

### B. *Procedural Reasonableness*

We begin by considering the procedural reasonableness of the district court's sentence. *See United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008). Mr. Rocha advances three arguments to show that the district court's sentence was not procedurally reasonable. First, he contends that the court clearly erred by denying his request for an U.S.S.G. § 3E1.1 adjustment for acceptance of responsibility. Second, he argues that "[t]he district court used a procedurally unreasonable method to determine Mr. Rocha's sentence by relying on *society's expectations*, a factor not listed in the categories set forth in § 3553(a)."[3] Aplt.'s Opening Br. at 41 (emphasis

---

[3] Mr. Rocha contends that he preserved his societal expectations argument before the district court and thus asks us to review this challenge for abuse of discretion. Mr. Rocha's preservation contention is dubious at best. Mr. Rocha's societal expectations argument was not amongst the specific objections that he raised during the sentencing, and though he did voice "a general objection that the sentence is not procedural[ly] [or] substantively reasonable," Aplt.'s App., Vol. III, at 471, "[i]t is well established that such general objections to a district court's rulings are typically insufficient to preserve an argument on appeal," *United States v. Finnesy*, 953 F.3d 675, 700 (10th Cir. 2020). However, we need not dwell on this preservation question because, in its response brief, the government does not argue that Mr. Rocha did not preserve this challenge; instead, it analyzes the challenge under the abuse of discretion standard. In reply, Mr. Rocha argues that the government has itself therefore forfeited any argument that Mr. Rocha forfeited this procedural reasonableness challenge. And we agree with Mr. Rocha. Thus, even if Mr. Rocha did not preserve this challenge before the district court, we would exercise our discretion to reach the merits of Mr. Rocha's societal expectations argument under

added) (bold typeface and italicization omitted).  Third, Mr. Rocha asserts that "[t]he

district court committed procedural error by failing to adequately explain why a

100% upward variance was necessary to serve sentencing purposes."  *Id.* at 45 (bold

typeface and italicization omitted).  Reviewing for abuse of discretion, we consider

each of Mr. Rocha's procedural reasonableness arguments and conclude that they are

unpersuasive.

**1.**

Mr. Rocha's first procedural reasonableness argument is that the district court

clearly erred by denying his request for a § 3E1.1 adjustment for acceptance of

responsibility because he accepted responsibility for his crime of conviction:

involuntary manslaughter.  The district court concluded that Mr. Rocha did not

accept responsibility because he "contest[ed] or at least didn't admit [] to the mens

rea of involuntary manslaughter."  Aplt.'s App., Vol. III, at 453.  The government

maintains that the court's denial of the § 3E1.1 adjustment was proper because Mr.

Rocha "never admitted his conduct rose to the level required for Involuntary

---

our abuse of discretion framework.  *See United States v. McGehee*, 672 F.3d 860, 873
n.5 (10th Cir. 2012); *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1138–39 (10th
Cir. 2010); *see also Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of
what questions may be taken up and resolved for the first time on appeal is one left
primarily to the discretion of the courts of appeals, to be exercised on the facts of
individual cases."); *cf. McGehee*, 672 F.3d at 873 n.5 ("[W]e are not obliged to apply
forfeiture principles to the government's briefing omission; such decisions are
discretionary.").

Manslaughter." Aplee.'s Resp. Br. at 21. We conclude that the district court did not clearly err in finding that Mr. Rocha did not accept responsibility.

**i.**

**a.**

A challenge to the district court's denial of an acceptance-of-responsibility adjustment "must be analyzed under the rubric of procedural error." *United States v. Herriman*, 739 F.3d 1250, 1254 (10th Cir. 2014); *see also United States v. McGehee*, 672 F.3d 860, 874 (10th Cir. 2012) (stating that such a claim is "a claim of procedural error"). Thus, "[w]hen considering whether the district court erred in denying a request for offense level reduction, we review legal conclusions under the Sentencing Guidelines de novo, and review findings of fact for clear error." *United States v. Collins*, 511 F.3d 1276, 1279 (10th Cir. 2008) (italicization omitted).

Within this procedural reasonableness framework, "[w]hether a defendant has accepted responsibility is a factual question that we review for clear error." *United States v. Hurst*, 94 F.4th 993, 1006–07 (10th Cir. 2024) (quoting *United States v. Lozano*, 514 F.3d 1130, 1133 (10th Cir. 2008)); *see also McGehee*, 672 F.3d at 877 (collecting cases). The district court has clearly erred if "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." *United States v. Battles*, 745 F.3d 436, 458 (10th Cir. 2014) (alteration in original) (quoting *United States v. Weed*, 389 F.3d 1060, 1071 (10th Cir. 2004)); *see also United States v. Sarracino*, 340 F.3d 1148, 1174 (10th Cir. 2003) (noting that a sentencing court's denial of the reduction "should not be disturbed unless it is

19

without foundation"). It is the defendant's burden to "prov[e] [his] entitlement to an acceptance-of-responsibility adjustment by a preponderance of the evidence.'" *Battles*, 745 F.3d at 458. Because "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility," we owe the district court's determination "great deference." U.S.S.G. § 3E1.1 cmt. n.5; *see also Herriman*, 739 F.3d at 1255.

**b.**

Our acceptance-of-responsibility adjustment analysis begins with the plain language of U.S.S.G. § 3E1.1(a), which provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense," the sentencing court must "decrease the offense level by 2 levels." *Herriman*, 739 F.3d at 1255 (alteration in original) (quoting U.S.S.G. § 3E1.1(a)). In determining whether a defendant qualifies for an adjustment under § 3E1.1(a), appropriate considerations include, but are not limited to: "truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3"; "voluntary surrender to authorities promptly after commission of the offense"; "voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense"; and "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n.1.

However, as a general rule, "[t]he acceptance-of-responsibility adjustment 'is not intended to apply to a defendant who puts the government to its burden of proof

20

at trial by denying the essential factual elements of guilt[] [and] is convicted.'"

*McGehee*, 672 F.3d at 877 (alterations in original) (emphasis omitted) (quoting

U.S.S.G. § 3E1.1 cmt. n.2).  Application Note 2 to § 3E1.1 sheds light on the "rare

situations" in which a defendant may qualify for the acceptance of responsibility

adjustment after taking their case to trial:

> Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction.  In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  This may occur, for example, where a defendant goes to trial to assert and preserve issues that *do not relate to factual guilt* (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).  In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1 cmt. n.2 (emphasis added).  "Accordingly, although a defendant has

a constitutional right to trial, exercising that right 'will commonly render him

ineligible for a § 3E1.1 reduction.'"  *United States v. Smith*, 100 F.4th 1244, 1250

(10th Cir. 2024) (quoting *United States v. Tom*, 494 F.3d 1277, 1281 (10th Cir.

2007)); *see also Tom*, 494 F.3d at 1281 ("[A]cceptance of responsibility adjustments

after trial are very rare." (quoting *United States v. Sims*, 428 F.3d 945, 961 (10th Cir.

2005))).

United States v. Gauvin, 173 F.3d 798 (10th Cir. 1999), remains the only

precedential decision in which we have upheld a district court's decision to grant an

acceptance-of-responsibility adjustment to a defendant who put the government to its

burden of proof in a jury trial.  *See Herriman*, 739 F.3d at 1256; *Tom*, 494 F.3d at

21

1281. In *Gauvin*, the defendant was charged with assault following an incident in which he drove drunk, fled a traffic stop, engaged in a high-speed car chase with police officers, and caused a dangerous collision with a police officer's vehicle. *See* 173 F.3d at 801.

The defendant admitted to all of the conduct for which he was charged, but he took the case to trial to argue that "he did not intend, while drunk and scared, to cause injury to others" and that "his drunkenness rendered him incapable of forming the requisite mens rea" to commit the crime. *Id.* at 806. The jury was unconvinced and entered a verdict of guilty. *See id.* At sentencing, the district court found that the defendant's conduct demonstrated acceptance of responsibility. *See id.* The defendant appealed his conviction, and the government cross-appealed, challenging, *inter alia*, the § 3E1.1 adjustment. *See id*. at 801.

On appeal, we affirmed the district court's interpretation of § 3E1.1. *See id.* at 806, 809. Specifically, the district court had found that "Mr. Gauvin is entitled to pursue the theory that he did all the[] things [on which the charges were based], but the one thing he didn't do is try to use his car to hurt the officers. That should not preclude him from acceptance of responsibility." *Id*. at 806 (alteration in original) (quoting the district court). As support for our conclusion, we pointed to the Sentencing Commission's instruction that the acceptance-of-responsibility adjustment "may apply where the defendant 'challenge[s] . . . the applicability of a statute to his conduct,'" *id*. (alteration and omission in original) (quoting U.S.S.G. § 3E1.1 cmt. n.2), and found that this instruction was applicable to the defendant's

22

case, *id.* ("Mr. Gauvin admitted to all the conduct with which he was charged. He simply disputed whether his acknowledged factual state of mind met the legal criteria of intent to harm or cause apprehension."). But we were clear that "[o]ur decision [to affirm the district court] rest[ed] in part on the fact that Mr. Gauvin went to trial *only to contest the legal element of intent*." *Id.* (emphasis added). "Although we recognize[d] that such adjustments are 'rare'" and acknowledged that we "might not have reached the same decision" in the first instance, we concluded that "in light of the deference afforded the sentencing judge, . . . the district court did not err in granting a downward departure for acceptance of responsibility." *Id*. (quoting U.S.S.G. § 3E1.1 cmt. n.2).

In the decades since *Gauvin* was decided, we have reiterated that it presented rare circumstances and thus a "narrow exception to the general rule that defendants who put the government to its burden of proof at trial are ineligible for the § 3E1.1 reduction." *Tom*, 494 F.3d at 1281. Of particular relevance here, in *Herriman*, we distilled our authority interpreting *Gauvin* into two key principles. First, we explained that:

> Since handing down our decision in *Gauvin*, . . . we have taken care to highlight the importance of the deferential standard of review to *Gauvin*'s holding. That is to say, "in *Gauvin*, we merely accorded the district court the requisite deference in upholding its decision to *grant* the two-level reduction." *McGehee*, 672 F.3d at 877. Significantly, "[w]e did not indicate that other sentencing courts would be obliged to reach the same conclusion on similar facts." [*Id.*] Quite to the contrary, "we might well uphold their decisions on similar facts to *deny* the acceptance-of-responsibility adjustment." [*Id.*]

*Herriman*, 739 F.3d at 1256 (first alteration in original) (additional citations omitted). In other words, "the [first] key principle is that we defer to the sentencing judge's resolution of the issue in all but the most unusual of circumstances." *United States v. Nevarez*, 55 F.4th 1261, 1267 (10th Cir. 2022).

The second key principle is that, "significantly, we have interpreted *Gauvin* to allow for adjustments only where a 'defendant admitted to all the conduct . . . but simply disputed whether his acknowledged factual state of mind met the legal criteria of intent required by the applicable statute.'" *Herriman*, 739 F.3d at 1257 (quoting *Tom*, 494 F.3d at 1281); *see also id.* ("Understood in this light, *Gauvin* offers no relief 'where defendants have challenged the *factual* element of intent.'" (quoting *Tom*, 494 F.3d at 1281)).

Pursuant to this second principle, we have placed special emphasis on distinguishing *Gauvin*'s challenge to the "*legal* criteria of intent," *Gauvin*, 173 F.3d at 806 (emphasis added), from challenges to the *factual* element of intent; as to the latter, we have "repeatedly upheld denials of, and reversed awards of" acceptance-of-responsibility adjustments, *Tom*, 494 F.3d at 1281.[4] Indeed, the preeminent through-

---

[4]    *See Gauvin*, 173 F.3d at 806 ("Our decision rests in part on the fact that [the defendant] went to trial only to contest the legal element of intent."); *United States v. Hill*, 197 F.3d 436, 446–47 (10th Cir. 1999) (noting that "[a]lthough it is true that [the defendant's] argument regarding the applicability of the bank fraud statute to his conduct is a purely legal one, he conveniently ignores the fact that he never admitted, prior to trial, all of the essential elements of the charged crimes" but rather "attempted to argue that his conduct was innocent and without intention to defraud"); *United States v. Salazar-Samaniega*, 361 F.3d 1271, 1281 (10th Cir. 2004) ("[The defendant] argued at trial that the government did not present sufficient evidence to prove the factual element of intent to distribute cocaine. . . . He thus

line in our § 3E1.1 authority is a diligent policing of the line that the Guidelines have

drawn that excludes the latter factual challenge from § 3E1.1 relief. *See*, *e.g.*, *Smith*,

100 F.4th at 1251 ("[A] defendant is not eligible for the § 3E1.1(a) reduction if he

---

forfeited his claim to an adjustment under § 3E.1.1 much like the defendant in
*Hill*."); *United States v. Herron*, 432 F.3d 1127, 1138 (10th Cir. 2005) (affirming the
district court's determination that a downward adjustment for acceptance of
responsibility was not warranted where the defendant challenged, *inter alia*, the
"knowing-possession" element of his 18 U.S.C. § 922(g)(1) charge and, thus, "did
not admit factual guilt"); *Tom*, 494 F.3d at 1281–82 ("[The defendant] sought
acquittal of both first- and second-degree murder charges on the grounds that . . . he
lacked the mens rea requisite for each . . . . By challenging the government on the
[factual] issue of intent, [the defendant] did not accept responsibility . . . under §
3E1.1."); *McGehee*, 672 F.3d at 878 ("[W]here [the defendant] went to trial, did not
stipulate to all of the factual elements of any count of conviction," including various
intent elements, "and indeed held the government to its ultimate burden on each
count, according appropriate deference to the district court, we conclude with no
difficulty that the court did not err in denying [the defendant] an offense-level
reduction for acceptance of responsibility."); *United States v. Melot*, 732 F.3d 1234,
1244 (10th Cir. 2013) (deeming the grant of a § 3E1.1 adjustment clear error where
the defendant "did not proceed to trial to preserve an issue unrelated to his factual
guilt" but rather "exercised his constitutional right to trial so he could challenge the
mens rea element of the crimes charged in the indictment"); *Herriman*, 739 F.3d at
1262 (affirming the district court's denial of a § 3E1.1 adjustment where the parties
"fiercely contested whether [the defendant] was—as a factual matter—psychotic at
the time he committed the charged acts" and explaining that "our law demands . . . a
showing that the legal aspect of [the defendant's] mental condition was the only
dimension of his condition that he put at issue by going to trial"); *Nevarez*, 55 F.4th
at 1267 (affirming a district court's denial of a § 3E1.1 adjustment where the
defendant conceded a possession of methamphetamine charge but put the government
to its burden of proof on the factual issue of intent to distribute on another charge);
*Smith*, 100 F.4th at 1251 (holding that the district court did not err in denying the
defendant's request for a § 3E1.1 adjustment where the defendant argued that he
"lacked the requisite mens rea for second-degree murder" because such statements
"provide a clear basis to conclude that [the defendant] challenged the factual element
of intent at trial").

25

'challenge[s] the factual element of intent.'" (quoting *Tom*, 494 F.3d at 1281)); *see also supra* note 4.

Under these principles, "[r]educed to its essence," the question presented by Mr. Rocha's § 3E1.1 challenge is whether "his case represented one of the 'rare situations' in which a defendant insists upon a trial and yet is still entitled to the benefit of the downward adjustment," *Herriman*, 739 F.3d at 1256—that is to say, a rare situation in which his challenge "do[es] not relate to factual guilt," U.S.S.G. § 3E1.1 cmt. n.2. We review this question with considerable deference to the sentencing judge's decision regarding the adjustment. *See Nevarez*, 55 F.4th at 1266–67. Ultimately, we answer the question in the negative, rejecting Mr. Rocha's challenge.

**ii.**

**a.**

Mr. Rocha reasons that, because he accepted responsibility for his crime of conviction, involuntary manslaughter, the district court clearly erred by denying him the § 3E1.1 adjustment. Mr. Rocha does not question the legal propriety of the district court's decision to focus its analysis on the crime of conviction in assessing whether his conduct qualified for the acceptance-of-responsibility adjustment. Instead, as a factual matter, Mr. Rocha simply argues that the district court clearly erred in finding that he did not accept responsibility for that crime of conviction. *See, e.g.*, Aplt.'s Opening Br. at 19. ("[Mr. Rocha] admitted to the *conduct* in support of his conviction, as well as the *mens rea* for involuntary manslaughter.").

26

Notably, the government also does not question the legal propriety of the district court's analytical focus on Mr. Rocha's crime of conviction in evaluating the sufficiency of his claim of acceptance of responsibility. For example, the government does not contend instead that the district court should have focused its analysis on the more serious offense charged in Mr. Rocha's indictment (i.e., first-degree murder) in assessing whether his conduct qualified for the acceptance-of-responsibility adjustment. Instead, the government simply contends that the district court's decision to deny the § 3E1.1 adjustment for acceptance of responsibility was not clearly erroneous because Mr. Rocha "never admitted his conduct rose to the level required for Involuntary Manslaughter." Aplee.'s Resp. Br. at 21.

Thus, under the parties' framing, the dispute is one of fact, not law. More specifically, the parties do not contest the propriety of the legal lens through which the district court assessed the sufficiency of Mr. Rocha's showing of acceptance of responsibility—that is, the lens of Mr. Rocha's crime of conviction. Rather, they only dispute, as a matter of fact, whether Mr. Rocha's acceptance showing was sufficient, when viewed through the lens of his crime of conviction. Guided by the principle of party presentation, that factual dispute is the one that we elect to resolve here. *See, e.g.*, *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation."); *id.* ("[As a general rule,] we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008))).

To be sure, we recognize our discretion to "affirm on any basis supported by the record." *Jordan v. U.S. Dep't of Just.*, 668 F.3d 1188, 1200 (10th Cir. 2011). However, we deem it unwise to exercise that discretion in this case. *See*, *e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1182 (10th Cir. 2023) (noting that "our preservation doctrines function *not* as absolute constraints on our power to review but, rather, more like prudential norms"). More specifically, we decline to exercise that discretion since the parties do not dispute the question of the proper legal lens in their appellate briefing: indeed, their arguments affirmatively apply the lens of the crime of conviction and do not even acknowledge the possibility of applying a different legal lens, notably the charge in the Indictment.

Consequently, we elide this open legal question of the proper lens through which to view a showing of acceptance of responsibility. Guided by party-presentation principles, we instead resolve this dispute as the parties have framed it. That is, we proceed to consider only the merits of Mr. Rocha's argument that the district court clearly erred by finding that he did not accept responsibility for his crime of conviction: involuntary manslaughter. And we ultimately reject his argument.

**b.**

Mr. Rocha urges us to find clear error in the district court's denial of the acceptance-of-responsibility adjustment on the theory that he accepted responsibility for involuntary manslaughter. As in past cases, Mr. Rocha's thesis, reduced to its essence, is "that his case represented one of the 'rare situations' in which a defendant

28

insists upon a trial and yet is still entitled to the benefit of the downward adjustment." *Herriman*, 739 F.3d at 1256; *see also* U.S.S.G. § 3E1.1 cmt. n.2. Accordingly, we look to "the entire evidence" and determine whether we are left with "the definite and firm conviction that a mistake has been committed." *Battles*, 745 F.3d at 458 (quotation omitted). We harbor no such conviction here.

Our review of the evidence reveals that the district court's decision to deny Mr. Rocha the adjustment was not clearly erroneous because the record at the very least plausibly shows that Mr. Rocha's conduct was inconsistent with acceptance of responsibility both before and during trial. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.").

At the outset, we observe that, immediately after shooting his mother, Mr. Rocha fled on foot and discarded the revolver into a ditch as he ran. Then he got into a truck and fled to McKinney, Texas, before ultimately returning to Oklahoma with his father and surrendering to law enforcement the next morning. By contrast, Ms. Eskue, Ms. Pierce, and Mr. Amix remained with Ms. Amix, called 911, and attempted to save her life by driving her to meet paramedics so that she could be transported to a hospital.

Turning to Mr. Rocha's "pre-trial statements and conduct," U.S.S.G. § 3E1.1 cmt. n.2, to be sure, Mr. Rocha ultimately surrendered to law enforcement and made

29

material admissions in a voluntary interview with investigators. Most notably, Mr. Rocha admitted that he shot his mother and described the episode as a "horrible accident." Aplee.'s Suppl. App., Vol. II, Gov't Ex. 29 at 00:09–00:29. Moreover, he told investigators where to find the gun that he had discarded.

But also notable are the actions Mr. Rocha did *not* take. After all, it is the defendant's burden to "prove[e] [his] entitlement to an acceptance-of-responsibility adjustment by a preponderance of the evidence." *Battles*, 745 F.3d at 458 (quotation omitted). Mr. Rocha avers that "[b]y insisting on a charge of first[-]degree murder, the government forced [him] to go to trial." Aplt.'s Opening Br. at 12. But unlike some defendants in our cases, Mr. Rocha did not offer to plead guilty before trial to involuntary manslaughter. *See Collins*, 511 F.3d at 1279–80 (addressing the defendant's argument that "he met the standard set forth in the Guidelines by offering before trial to plead guilty to the lesser-included offenses for which he was ultimately convicted"); *cf. Nevarez*, 55 F.4th at 1266 (finding *Collins*'s reasoning—to the effect "that 'the district court could reasonably have concluded that [the defendant's] offer to plead guilty and his admissions at trial were strategic, rather than evidence of true acceptance [of] responsibility'"—both "*factually analogous*" and "particularly instructive" (first alteration in original) (emphasis added) (quoting *Collins*, 511 F.3d at 1280)). Nor did Mr. Rocha offer to make factual stipulations to establish any of the elements of his guilt. *See McGehee*, 672 F.3d at 878 ("[O]n these facts, where [the defendant] went to trial, did not stipulate to all of the factual elements of any count of conviction, and indeed held the government to its ultimate burden on each

count, . . . we conclude with no difficulty that the court did not err in denying [the defendant] an offense-level reduction for acceptance of responsibility."); *Herron*, 432 F.3d at 1138–39 (declaring that "we would find an abuse of discretion if the district court *had* granted the downward adjustment" where, *inter alia*, "[the defendant] stipulated only to the first element" of the charged offense and refused to stipulate to other elements).

Finally, Mr. Rocha actively participated in the trial itself—he cross-examined all but one witness—and thereby tested the government's case. *See Hurst*, 94 F.4th at 1010 (concluding that the district court did not clearly err in denying the defendant a two-level reduction for acceptance of responsibility where, *inter alia*, the defendant "cross-examined each government witness"); *Herron*, 432 F.3d at 1139 (noting that "defense counsel tested [two government witnesses'] testimony on cross-examination" in support of our finding that "[t]he district court's determination [to deny the acceptance-of-responsibility adjustment] was certainly not clearly erroneous"). And as in *Herron*, in which we found no error in the district court's denial of the § 3E1.1 adjustment, Mr. Rocha "never claimed that the trial was held only to preserve issues unrelated to factual guilt so that those issues could be appealed." *Herron*, 432 F.3d at 1139; *cf. Gauvin*, 173 F.3d at 806 (disputing only "whether his acknowledged factual state of mind met the legal criteria of intent").

These actions that Mr. Rocha did *not* take bolster the district court's view that Mr. Rocha "contest[ed] or at least didn't admit [] to the mens rea of involuntary manslaughter." Aplt's App., Vol. III, at 453. Notably, even the actions taken by the

31

defendants in *Collins*, *Neverez*, *Herron*, and *McGehee* were not enough to show the sentencing courts that they presented the "rare situations" contemplated by the Guidelines. U.S.S.G. § 3E1.1 cmt. n.2. It would seem to ineluctably follow that Mr. Rocha—who did *not* take any of the highlighted actions of those defendants—should not be better situated to show that his circumstances amounted to such a "rare" situation and thus warranted an acceptance-of-responsibility adjustment.

On this record, we are not left with a "definite and firm conviction" that the district court made a mistake. *Battles*, 745 F.3d at 458 (quotation omitted). Quite to the contrary, we are confident that the district court's finding—that Mr. Rocha substantially put the government to its trial burden and, consequently, did not warrant the adjustment—was, at a minimum, plausible. *See Anderson*, 470 U.S. at 574.

To be sure, Mr. Rocha argues that his admissions in the pretrial interview with law enforcement should be enough to show clear error in the district court's acceptance-of-responsibility finding because Mr. Rocha admitted that he accidentally shot his mother. But § 3E1.1 impels us to remember that "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility" and, accordingly, that "the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1 cmt. n.5. To counter this dispositional leaning, at most, Mr. Rocha offers a second plausible view of the evidence and, in particular, the import of his pretrial interview. Yet the contrary view—that the totality of Mr. Rocha's conduct, *both* before and at the trial, did not demonstrate acceptance of responsibility—is also plausible. And under our deferential standard

32

of review, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *McGehee*, 672 F.3d at 877 (quoting *Anderson*, 470 U.S. at 574). Indeed, even when "we 'might not have reached the same decision[;] . . . the deference afforded the sentencing judge' compel[s] us to affirm." *Nevarez*, 55 F.4th at 1266 (omission in original) (quoting *Gauvin*, 173 F.3d at 806).

Therefore, we "conclude with no difficulty" that the district court did not clearly err in finding that Mr. Rocha failed to carry his burden of showing acceptance of responsibility for his count of conviction, involuntary manslaughter. *McGehee*, 672 F.3d at 878; *see also Anderson*, 470 U.S. at 574. Accordingly, we will not disturb the court's decision to deny Mr. Rocha the two-level § 3E1.1 adjustment. *Collins*, 511 F.3d at 1279.

### 2.

Mr. Rocha's second procedural reasonableness argument turns on whether the district court considered "society's expectations" as a distinct, impermissible sentencing factor. We conclude to the contrary: specifically, that the court merely invoked "society's expectations" in framing its consideration of permissible sentencing factors enumerated in 18 U.S.C. § 3553(a). Accordingly, we reject Mr. Rocha's second argument.

Section 3553(a) requires district courts to consider seven factors in sentencing:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for a sentence to reflect the "basic aims of sentencing, namely (a) 'just punishment'

33

(retribution), (b) deterrence, (c) incapacitation, and (d) rehabilitation"; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established in the Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need for restitution.

*Crosby*, 119 F.4th at 1247 (quoting *United States v. Walker*, 844 F.3d 1253, 1256 (10th Cir. 2017)).  Because "[§] 3553(a) mandates consideration of its enumerated factors," it "implicitly forbids consideration of factors outside its scope." *Smart*, 518 F.3d at 803–04.  Thus, "if a district court bases a sentence on a factor not within the categories set forth in § 3553(a), this would [] be one form of procedural error." *Id.* at 803.

Mr. Rocha argues that "[i]t was procedural error for the district court to base a sentence on a factor"—society's expectations—that is "not within the categories set forth in § 3553(a)."[5]  Aplt.'s Opening Br. at 42.  It cannot be gainsaid that the district

---

[5]    At the outset, the government argues that Mr. Rocha's societal expectations argument is barred by the doctrine of invited error.  *See United States v. Edward J.*, 224 F.3d 1216, 1222 (10th Cir. 2000) ("The invited error doctrine prevents a party from inducing action by a court and later seeking reversal on the ground that the requested action was error." (quoting *United States v. Johnson*, 183 F.3d 1175, 1178 n.2 (10th Cir. 1999))).  For example, the district court appeared to directly echo defense counsel's comments when it remarked that "at this time[,] based on your history, I do believe [] your counsel's representation that you will go back to work and try to be a productive member of society."  Aplt.'s App., Vol. III, at 464.  Yet we need not—and thus do not—definitively opine on whether defense counsel's comments ultimately provided a proper foundation for the application of the invited error doctrine because we conclude that the district court's use of the language of societal expectations did not amount to error in the first place.  *See United States v. McBride*, 94 F.4th 1036, 1046 n.14 (10th Cir. 2024) (declining to "navigate the invited error thicket" in light of other "sufficient grounds to affirm in the circumstances here").

court's explanation of its sentence included references to society's expectations. In particular, the court stated:

> Mr. Rocha, you're a young man. You will have -- this will be behind you. You'll have a lot of life to live. You'll have a lot of making up to do to both your family and society because of what you did. You'll have time to do it.
>
> . . . .
>
> But there's also the issue of punishment. There's the issue of *what society expects* of the criminal justice system when someone shoots and kills a family member in a completely avoidable, irresponsible, reckless event like that where you point a cocked firearm with a hair trigger at your mother, okay?
>
> There's *what society expects* that we do and what provides some level of justice to the victim.

Aplt.'s App., Vol. III, at 463–64 (emphases added).

However, a comparison of the district court's sentencing remarks and the § 3553(a) factors reveals that the district court's invocation of society's expectations was subsumed within its legitimate consideration of several § 3553(a) sentencing factors: (1) "the nature and circumstances of this offense, notably, the multiple attempts to use a firearm in an altercation with [Mr. Rocha's] stepfather"; (2) the "need for just punishment"; and (3) "deterrence." Aplt.'s App., Vol. III, at 470. Context matters. That is, "read in context, [] it is clear that the district court's [reference to societal expectations] was not offered as a [standalone] justification for its ultimate sentencing decision." *Smart*, 518 F.3d at 805; *see also Sayad*, 589 F.3d at 1117 (concluding that the district court did not commit procedural error by referencing the defendant's Iranian-Christian status where "[r]eview of the transcript

35

of the sentencing hearing reveals the district court did not base its sentence on [said] status"). In other words, the court's statements about society's expectations do not evince the court's consideration of such expectations as a separate sentencing factor. Instead, the court simply used those expectations, in part, to frame its consideration of the foregoing, permissible sentencing factors.

For example, the court first explained that "there's [] the issue of *punishment*. There's the issue of what *society expects of the criminal justice system* when someone shoots and kills a family member *in a completely avoidable, irresponsible, reckless event* like that where you point a cocked firearm with a hair trigger at your mother." *Id.* at 464 (emphases added). In these remarks, the court uses the language of societal expectations to frame its consideration of just punishment, a permissible sentencing factor. Further, the court described just punishment, in part, as the punishment society expects of the criminal justice system when a defendant shoots and kills a family member. The court also noted that "[t]here's what *society expects* that we do and what provides some level of *justice to the victim*." *Id.* (emphases added). In this latter statement, the court discussed societal expectations in connection with justice for the victim—the retributive element of a "just" punishment.

Similarly, the question of what punishment society expects vis-à-vis a "completely avoidable, irresponsible, reckless" shooting implicates another permissible factor: the nature and circumstances of the offense. *Id.* Additionally, societal expectations naturally figure into the court's emphasis on ensuring that the

36

punishment imposed would be sufficient to deter similar future conduct.  Thus, the

foregoing passages reveal that the district court did not rely on society's expectations

as a standalone sentencing factor but rather as an analytical frame through which it

considered several permissible sentencing factors—namely, the nature and

circumstances of the offense, just punishment, and deterrence.

Mr. Rocha's arguments to the contrary are unpersuasive.  He maintains that

because "society's expectations are baked into the guidelines," the district court

procedurally erred by "us[ing] societal expectations as a justification for an upward

variance."  Aplt.'s Reply Br. at 17 (quotation omitted).  As we have noted, however,

the district court did not use societal expectations as an independent factor justifying

a variance.  And because the court did not do so, there was no need or occasion for it

to separately explain how societal expectations justified a variant sentence.

Moreover, where, as here, the sentencing court has determined that the advisory

Guidelines range does not adequately reflect the seriousness of the offense, or justly

punish and sufficiently deter the defendant, and thus varies upward, it has effectively

determined—on the factual circumstances of the particular case—that the advisory

Guidelines range does not adequately express societal expectations *as they relate to*

these permissible sentencing factors.  *Cf. United States v. Goossen*, 723 F. App'x

608, 609 (10th Cir. 2018) (concluding that the district court's sentence was

procedurally reasonable where, *inter alia*, "the court explained that the guideline

range inadequately satisfied the need for the sentence imposed 'to afford adequate deterrence to criminal conduct' under § 3553(a)(2)(B)").[6]

In sum, in our view, the record reflects that the district court invoked societal expectations merely to frame its consideration of the permissible § 3553(a) factors that it weighed in its sentencing determination—notably, the nature and circumstances of the offense, just punishment, and deterrence.  Nowhere in the record does the district court discuss societal expectations independently of permissible sentencing factors.  Accordingly, we conclude that Mr. Rocha's procedural reasonableness challenge based on the district court's consideration of societal expectations fails.

**3.**

In his third procedural reasonableness argument, Mr. Rocha avers that "[t]he district court committed procedural error by failing to adequately explain why a 100% upward variance was necessary to serve sentencing purposes."  Aplt.'s Opening Br. at 45 (bold typeface and italicization omitted); *see also Gall*, 552 U.S. at 51 (holding that the district court must "adequately explain the chosen sentence— including an explanation for any deviation from the Guidelines range").[7]  We

---

[6]    We rely on unpublished cases for their persuasive value only and do not treat them as binding precedent. *See United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

[7]    Specifically, Mr. Rocha cites our decision in *Cookson* to emphasize that "a district court commits procedural error when it focuses 'almost exclusively' on one factor and pays 'inadequate attention to a number of other statutory factors.'" Aplt.'s Opening Br. at 46 (quoting *Cookson*, 922 F.3d at 1093–94).  Mr. Rocha

disagree with Mr. Rocha. For purposes of this discussion, we accept the premise that the variance at issue in Mr. Rocha's case was not insignificant. And as we underscored in *Cookson*, "a major [variance] should be supported by a more significant justification than a minor one." 922 F.3d 1092 (alteration in original) (quoting *Gall*, 552 U.S. at 50).

In our view, the district court's explanation here was sufficient to satisfy this standard—even though it admittedly was not fulsome. It was not, for example, so "limited, brief, or inconsistent" that it has hindered our ability "to conduct 'meaningful appellate review'" of Mr. Rocha's sentence or the court's basis for imposing it. *Id.* at 1091 (quoting *Gall*, 552 U.S. at 50); *accord Lente I*, 647 F.3d at 1038–39; *see also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has . . . a reasoned basis for exercising his own legal decisionmaking authority.").

Rather, the record shows that the district court "adequately explain[ed] the chosen sentence" in sufficient detail—including weighing the § 3553(a) factors in light of the unique facts of this case—for us to review its reasoning on appeal. *Gall*,

---

maintains that the district court violated this principle by focusing almost exclusively on "its personal view of the trial evidence—which differed from the jury's—as justification for the variance," including by "consider[ing] 'the multiple attempts to use a firearm in an altercation with the defendant's stepfather.'" *Id.* (quoting Aplt.'s App., Vol. III, at 470). In Mr. Rocha's view, this rendered the district court's explanation inadequate. *Id.* However, Mr. Rocha's reliance here on *Cookson* is misplaced. There, the court was not discussing procedural reasonableness. *See Cookson*, 922 F.3d at 1095.

552 U.S. at 51. At a general level, the district court explained that its sentence was "based on my first-hand observation of the evidence presented during the trial in this case," and the court noted that it "considered the nature and circumstances of this offense," the "need for just punishment," and "deterrence" when deciding to vary upward. Aplt.'s App., Vol. III, at 470, 473; *see also Sayad*, 589 F.3d at 1118 n.4 ("District courts are granted wide discretion in choosing which factors to rely on in determining whether a variance is justified under § 3553(a) . . . .").

The district court also pointed to several specific facts from the record that it considered in reaching its decision, namely: "the multiple attempts to use a firearm in an altercation with the defendant's stepfather"; "[t]he defendant's disposal of the firearm immediately after the shooting"; and "his immediate flight from the state[] and from the scene of the shooting after the homicide." Aplt.'s App., Vol. III, at 469–70. Moreover, the district court explained that its sentence was based on its balancing of the § 3553(a) factors—in light of both the aggravating and mitigating facts of Mr. Rocha's case. *Compare, e.g.*, *id.* at 464 (considering the aggravating fact that Mr. Rocha "point[ed] a cocked firearm with a hair trigger at [his] mother"), *with id.* (considering Mr. Rocha's mitigating personal attributes in its statement that "I do believe . . . that you will go back to work and try to be a productive member of society" after incarceration).

The sentencing remarks of the court here distinguish Mr. Rocha's case from other Tenth Circuit cases in which we have held that the sentencing court committed procedural error by offering an inadequate explanation. For example, this is not a

40

case in which the district court's explanation was "short and generic," failed to include details "unique to [the defendant] or the circumstances of [his] offense," did "little more than recite the [sentencing] factors," or otherwise "offer[ed] no indication at all of how the district court arrived at the sentence it imposed." *United States v. Clark*, 981 F.3d 1154, 1169 (10th Cir. 2020); *see United States v. Mendoza*, 543 F.3d 1186, 1192 (10th Cir. 2008) (concluding that the district court's variance was procedurally unreasonable where "the court's statement contained references to most of the relevant factors" but was otherwise "general in nature and unrelated to the specific defendant before it" and "did not articulate one fact about [the defendant] or his crime, other than to note that [the defendant] would likely be deported and thus would not benefit from prison educational programs"); *see also United States v. Brown*, 654 F. App'x 896, 915 (10th Cir. 2016) (concluding that the district court's sentence was procedurally unreasonable because the court's explanation was brief, generic, and offered no basis for meaningful appellate review).

Here, the district court's explanation satisfied our requisite standards. More specifically, it was tailored to Mr. Rocha and his offense conduct, and it indicated how the court arrived at its decision to vary upwards from the Guidelines range by citing the specific sentencing factors and facts which weighed most heavily in its sentencing decision. *See Clark*, 981 F.3d at 1169. Therefore, the district court offered an explanation that is sufficient to enable meaningful appellate review. *See Cookson*, 922 F.3d at 1091–92.

Mr. Rocha nevertheless asserts that the district court's explanation was inadequate insofar as it relied on "the reckless nature of the offense," his disposal of the firearm, and his flight after the shooting because those factors were already contemplated by the Guidelines.  Aplt.'s Opening Br. at 47.  But we have held that a district court does not commit procedural error when it relies on the same facts to support both a Guidelines calculation and a variance, so long as it "articulate[s] specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the guidelines calculation." *United States v. Atencio*, 476 F.3d 1099, 1107 (10th Cir. 2007) (quoting *United States v. Zapete-Garcia*, 447 F.3d 57, 60 (1st Cir. 2006)), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708, 713 n.1 (2008); *accord United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1222–23 (10th Cir. 2008).  And we have clarified that "[t]his explanation 'need not be overly detailed.'"  *Alapizco-Valenzuela*, 546 F.3d at 1223 (quoting *Atencio*, 476 F.3d at 1106).

Here, the district court's explanation was sufficient to satisfy this standard.  In imposing the variance, the district court emphasized that Mr. Rocha's offense conduct was "completely avoidable, irresponsible, [and] reckless" because he "point[ed] a cocked firearm with a hair trigger at [his] mother."  Aplt.'s App., Vol. III, at 464.  We interpret the court's statements, in their totality, as expressing the view that the reckless nature of Mr. Rocha's conduct was extraordinary—in other words, it extended beyond the conduct contemplated by his base offense level and

Guidelines range.  In sum, we conclude that the district court's explanation of its variance—which we have assumed to be significant—was adequate.

* * *

For all of the foregoing reasons, we conclude that Mr. Rocha's sentence was procedurally reasonable, and we reject his contrary arguments.

### C. *Substantive Reasonableness*

Lastly, Mr. Rocha contends that the district court abused its discretion by imposing a substantively unreasonable sentence.  *See Sayad*, 589 F.3d at 1116 ("[We] review[] sentences for reasonableness under a deferential abuse-of-discretion standard.").  Specifically, Mr. Rocha argues that the district court's "substantial variance," Aplt.'s Opening Br. at 23 (bold typeface and italicization omitted), was unreasonable because the Guidelines range "fully captured Mr. Rocha's offense conduct and criminal history," *id.* at 25 (same), and he maintains that "there are no sufficiently compelling reasons to justify the substantial variance from the Guidelines range," *id.* at 23 (same).  We find these arguments unpersuasive and conclude that the district court's decision to impose an upward variance "is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Cookson*, 922 F.3d at 1091 (quoting *Friedman*, 554 F.3d at 1307).

### 1.

Mr. Rocha first emphasizes that the variance in his case was "substantial." Aplt.'s Opening Br. at 23.  Invoking *Gall*, he reminds us that "[i]n imposing a sentence outside the guideline[s] range, district courts must 'consider the extent of

43

the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance,'" and that "[a] major variance . . . requires 'a more significant justification than a minor one.'"  Aplt.'s Opening Br. at 24 (quoting *Gall*, 552 U.S. at 50).  He urges us to examine the degree of the variance "in terms of both percentage and absolute time" and emphasizes that the district court "imposed a 100% variance from a guideline range of 27–33 months to 60 months."  *Id.* 24–25.  "This substantial variance," Mr. Rocha concludes, "was unsupported by a sufficiently compelling justification" and thus constituted a substantive error.  *Id.* at 12.

Although we have assumed *supra* for purposes of our analysis that the court's variance was significant, we cannot conclude that the degree of variance rendered the district court's sentence substantively unreasonable.  In *Gall*, the Supreme Court held that "appellate courts *may* [] take the degree of variance into account and consider the extent of a deviation from the Guidelines."  552 U.S. at 47 (emphasis added).  But in virtually the same breath, the Court "reject[ed]" both "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range" and "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence."  *Id.*

Here, the district court's variance—from a relatively low Guidelines range of 27 to 33 months to 60 months—was admittedly a near-100% variance above the top of the Guidelines range.  And, consequently, Mr. Rocha argues that our review should be framed by viewing the 100% variance as a "substantial" one.  However,

*Gall* spoke to the exact circumstance that Mr. Rocha's sentence presents, in which "deviations from the Guidelines range will always appear more extreme—in percentage terms—when the range itself is low." 552 U.S. at 47–48. Applying this wisdom from *Gall*, it is not obvious why we should label the variance here a substantial one because of the percentage deviation from the Guidelines range, nor, more importantly, classify the resulting sentence as substantively unreasonable simply because of this percentage deviation.

But Mr. Rocha also argues that the variance was unreasonable in light of its "absolute time"—27 months above the top of the Guidelines range. But here too, Mr. Rocha's focus on the magnitude of the variance gives us pause. "Although the degree of variance from the Guidelines range remains a *consideration* on appeal, it may not define our threshold standard of review." *Smart*, 518 F.3d at 807 (citing *Gall* 552 U.S. at 47); *see also id.* at 805–09 (detailing our present standard of review, following the Supreme Court's decisions in *Gall* and *Kimbrough v. United States*, 552 U.S. 85 (2007)). We assume for purposes of analysis that the 27-month variance here is significant, and we acknowledge that we may permissibly take that significance into account in determining the substantive reasonableness of the court's sentence under *Gall*. But that significance is not determinative. *See, e.g.*, *United States v. McCrary*, 43 F.4th 1239, 1249 (10th Cir. 2022) (noting where "the district court varied upward from the advisory guideline range to impose a sentence four times as long as the high end of that range," that "[w]hile another sentencing court might have reasonably imposed a shorter sentence, we cannot say that the . . . above-

45

guideline sentence the district court imposed was arbitrary, unreasonable, or outside the range of permissible choice"). We proceed to apply our usual "abuse-of-discretion standard, looking at the 'totality of the circumstances'" at play in Mr. Rocha's case. *Cookson*, 922 F.3d at 1090 (quoting *United States v. Balbin-Mesa*, 643 F.3d 783, 787 (10th Cir. 2011)).

**2.**

As we have explained *supra*, in deciding to vary upward from Mr. Rocha's advisory Guidelines range, the district court cited, in particular, three § 3553(a) factors—the nature and circumstances of the offense, just punishment, and deterrence—and highlighted several facts—including Mr. Rocha's "multiple attempts to use a firearm," his "disposal of the firearm," and his "immediate flight from the state[] and from the scene of the shooting." Aplt.'s App., Vol. III, at 469–70. Moreover, the court clarified, generally, that "[t]o the extent that I haven't already enumerated my variance, my upward variance, is also based on my first-hand observation of the evidence presented during the trial in this case." *Id.* at 473. And in its initial discussion of the § 3553(a) factors, the court characterized Mr. Rocha's offense conduct as "completely avoidable, irresponsible, [and] reckless" because Mr. Rocha "point[ed] a cocked firearm with a hair trigger at [his] mother." *Id.* at 464.

Mr. Rocha avers that the court's "above-guideline sentence was substantively unreasonable because the Guidelines calculated a sentencing range that fully captured Mr. Rocha's offense conduct and criminal history." Aplt.'s Opening Br. at 25 (bold typeface and italicization omitted). Specifically, Mr. Rocha argues that his base

offense level under the Guidelines accounted for recklessness and that, therefore, "it [was] unreasonable for the district court to vary upward because his conduct was reckless." *Id.* at 25–26. But the district court was not obliged to put aside Mr. Rocha's recklessness in its consideration of the § 3553(a) factors just because his Guidelines range took recklessness into account. *See United States v. Lente ("Lente II")*, 759 F.3d 1149, 1169 (10th Cir. 2014) ("[U]nder current precedent '[d]istrict courts have broad discretion to consider particular facts in fashioning a sentence under 18 U.S.C. § 3553(a), even when those facts are already accounted for in the advisory guidelines range.'" (second alteration in original) (quoting *United States v. Yanez-Rodriguez*, 555 F.3d 931, 946 (10th Cir. 2009), *abrogated on other grounds as recognized by United States v. Bullcoming*, 579 F.3d 1200, 1205 (10th Cir. 2009))); *accord United States v. Gross*, 44 F.4th 1298, 1304 (10th Cir. 2022); *see also Barnes*, 890 F.3d at 921 (rejecting the "suggest[ion] the district court could not justify a variance by relying on facts that the Guidelines already took into account").

As we discussed *supra*, we understand the district court to have viewed the recklessness of Mr. Rocha's conduct as extraordinary and, thus, not fully accounted for by his Guidelines range. In other words, the court concluded that Mr. Rocha's conduct did not amount to a run-of-the-mill involuntary manslaughter case because of the degree of its inherent recklessness. And, consequently, this conduct in part supported (what we have assumed to be) a significant non-Guidelines sentence— specifically, an upward variance of 27 months from the Guidelines range.

47

In our review on appeal, "'we must . . . defer not only to a district court's factual findings' in support of a variance, 'but also to its determinations of the weight to be afforded to such findings.'" *United States v. Singer*, 825 F.3d 1151, 1159 (10th Cir. 2016) (omission in original) (quoting *Lente II*, 759 F.3d at 1158). Under this deferential standard of review, we cannot say that the district court's determination that Mr. Rocha's offense conduct was extraordinarily reckless and deserved to be weighed heavily in the court's application of the § 3553(a) factors ultimately rendered his sentence substantively unreasonable. *See Lente II*, 759 F.3d at 1166 (upholding the district court's "substantial upward variance" in an involuntary manslaughter case where the court relied in significant part on its finding that the defendant's conduct exhibited "extraordinary recklessness").

### 3.

Next, Mr. Rocha mounts several challenges to the district court's analysis of the § 3553(a) factors. *See* Aplt.'s Opening Br. at 27 ("The district court's articulated and apparent reasons for sentencing Mr. Rocha to a term twice the Guidelines range were substantively unreasonable." (bold typeface and italicization omitted)). For example, Mr. Rocha argues that "[i]t was substantively unreasonable for the district court to double Mr. Rocha's guideline sentence because he dropped his gun as he ran away," *id.* at 37 (bold typeface and italicization omitted), and that "[t]he district court gave too much weight to the 'need for just punishment and deterrence' given Mr. Rocha's 'history and characteristics,'" *id.* at 38 (same). In effect, Mr. Rocha challenges the substantive reasonableness of the district court's sentence through a

48

"divide and conquer" methodology.  But such an approach is barred by our precedent.

More specifically, "[w]e may not examine the weight a district court assigns to various § 3553(a) factors, and its ultimate assessment of the balance between them, as a legal conclusion to be reviewed de novo."  *Smart*, 518 F.3d at 808; *accord Singer*, 825 F.3d at 1159; *see also Gall*, 552 U.S. at 56 (admonishing the court of appeals where it "correctly stated that the appropriate standard of review was abuse of discretion," but then nevertheless "engaged in an analysis that more closely resembled de novo review of the facts presented and determined that, in its view, the degree of variance was not warranted").  Nor does our law require the district court to rely on every factor set forth in § 3553(a).  *See Barnes*, 890 F.3d at 916 ("[N]o algorithm exists that instructs the district judge how to combine the factors or what weight to put on each one.").  Instead, we must review for abuse of discretion, "giv[ing] due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance."  *Smart*, 518 F.3d at 808 (quoting *Gall*, 552 U.S. at 39).

Under this "highly deferential standard of review," *Sayad*, 589 F.3d at 1118, we conclude that the district court did not abuse its discretion by determining that the nature and circumstances of the offense—including Mr. Rocha's extraordinary recklessness—just punishment, and deterrence warranted a 27-month variance.[8]  Mr.

---

[8]    The district court's conclusion that Mr. Rocha's conduct was extraordinarily reckless, in particular, draws considerable support from the record.

49

Rocha does not appear to challenge the district court's factual findings as to these factors on appeal, and we see no reason to conclude that the district court's determinations of the weight to be afforded to such findings are "arbitrary, capricious, whimsical, [] manifestly unreasonable," or otherwise undeserving of the usual deference afforded to the sentencing court.[9] *Crosby*, 119 F.4th at 1246; *see also Singer*, 825 F.3d at 1159 ("'[W]e must . . . defer not only to a district court's factual findings' in support of a variance, 'but also to its determinations of the weight to be afforded to such findings.'" (omission in original) (quoting *Lente II*, 759 F.3d at 1158)); *Barnes*, 890 F.3d at 916 ("A district court properly engages in [a holistic

---

For example, the evidence showed that Mr. Rocha consumed a significant amount of alcohol, became hysterical after Mr. Amix attacked him, and attempted to arm himself on three occasions. After successfully procuring a single-action revolver on his third attempt, which he knew was loaded, Mr. Rocha proceeded to cock the pistol's hammer, and attempted to re-engage Mr. Amix. When confronted by his mother, aunt, cousin, and pregnant girlfriend, he waved his hands erratically in the air, holding the hair-triggered pistol with its hammer pulled back, which would permit it to fire. Eventually, the gun discharged, and Mr. Rocha's mother fell. The district court's conclusion that Mr. Rocha's conduct was extraordinarily reckless— that is, his recklessness was not captured in his Guidelines range—was far from clearly erroneous in light of this record support. *See Gantt*, 679 F.3d at 1246; *Lente II*, 759 F.3d at 1169; *cf. Smart*, 518 F.3d at 810 (upholding a sentencing court's determination that the Guidelines range did not reflect "the seriousness of his offense" where it was similarly "supported by evidence in the record").

[9]    Mr. Rocha further argues that "[b]y imposing a 60-month sentence, the district court treated Mr. Rocha as if he were a different person, one with a Criminal History of V rather than I." Aplt.'s Opening Br. at 26. But Mr. Rocha's contention that the upward variance treated him as if he had a higher criminal history has no footing in any specific statements or conduct of the district court. And "[w]e may not examine the weight a district court assigns to various § 3553(a) factors, and its ultimate assessment of the balance between them, as a legal conclusion to be reviewed de novo." *Smart*, 518 F.3d at 808.

50

inquiry of the § 3553(a) factors] when it bases its decision on specific, articulable facts supporting the variance and does not employ an impermissible methodology or rely on facts that would make the decision out of bounds.").

Nor has Mr. Rocha persuaded us that the district court's weighing of the § 3553(a) factors was somehow marred by legal error. *See Lopez-Avila*, 665 F.3d at 1219; *Koon*, 518 U.S. at 100. Put simply, the district court's sentence did not "'exceed[] the bounds of permissible choice,' given the facts and the applicable law in the case at hand." *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007) (quoting *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)); *see also Lente II*, 759 F.3d at 1166; *cf. Singer*, 825 F.3d at 1160 (upholding an 18-month variance where, *inter alia*, the district court relied on facts showing that "an aspect of 'the nature and circumstances of the offense,' 18 U.S.C. § 3553(a)(1), [] was otherwise not accounted for by the Guidelines applicable to [the defendant's] case"); *McCrary*, 43 F.4th at 1250 (similarly upholding the district court's decision to vary 36 months above the Guidelines range based on the nature and circumstances of the offense—specifically, the weight the court placed on the extraordinary "dangerousness of the fentanyl that [the] defendant distributed").[10]

---

[10]     Mr. Rocha's additional arguments to the contrary do not disturb our conclusion. He contends that "[t]he district court refused to impose a guideline sentence due to a personal belief that the jury should have convicted Mr. Rocha of murder," Aplt.'s Opening Br. at 27 (bold typeface and italicization omitted), and attempts to string together evidence to show that the district court had a bias in favor of a sentence based on the murder charge in his case, *see id.* at 27–31. But this allegation finds no support in the record. As the government correctly points out, the district court did even not sentence Mr. Rocha to the statutory-maximum sentence for

* * *

We conclude, therefore, that the district court's sentence was substantively reasonable.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's sentencing judgment.

---

involuntary manslaughter, as might have been expected if the court harbored such a murder-sentencing bias. Indeed, Mr. Rocha's 60-month sentence is three years below the statutory maximum for involuntary manslaughter. *See* 18 U.S.C. § 1112 (setting the statutory maximum for involuntary manslaughter at eight years). Accordingly, Mr. Rocha's murder-bias argument is meritless.

Mr. Rocha also rehashes his societal expectations argument in the substantive reasonableness section of his brief. Aplt.'s Opening Br. at 32 ("It was substantively unreasonable for the district court to consider 'what society would expect that we do' to justify imposing a sentence that is twice the applicable guideline range." (bold typeface and italicization omitted)). But we already have rejected this argument *supra* when discussing the issue of procedural reasonableness.